## HARRISON & SAUNDERS *vs.* HARRISON.

20  629
95  447
20  629
98  376

1. Husband and wife constitute in legal contemplation but one person, and cannot therefore, be domiciled in different States, so long as the relation remains unimpaired, upon which their legal identity depends.

2. Where the parties married in South Carolina, and there resided for several years, and afterwards removed to this State, where the husband permanently settled, the wife's *legal* domicil is in this State, notwithstanding she has been forced, by her husband's cruel treatment, to abandon him, and seek the protection of her friends in South Carolina.

3. No other State has jurisdiction to annul, or materially to impair the marriage relation between citizens of this State; and having no jurisdiction of the subject matter, consent of parties cannot confer it.

4. Where the marriage was celebrated in South Carolina, and the husband, by his cruel treatment of his wife while domiciled in that State, compelled her to abandon him and return to her parents, and afterwards, by promises of amendment, persuaded her to return to him, which promises he never fulfilled, but removed with her to this State, and by his renewed misconduct and ill-treatment again compelled her to abandon him and seek the protection of her friends and relatives in South Carolina, where she subsequently filed a bill in equity to compel him to make provision for herself and her infant child, and to enjoin him from molesting her. *It was held:*

   1. That the decree of the Chancery Court in South Carolina, in accordance with the prayer of the bill, was but enforcing the duties and obligations of the marriage relation, and did not annul or materially impair it.

   2. That the condonation, on the part of the wife, of her husband's past transgressions, was rendered inoperative by his subsequent ill-treatment, and that she became thereby remitted to her original remedy against him.

   3. That the removal of the parties to this State did not deprive the wife of her remedy for past transgressions in the State of South Carolina.

   4. That the wife's actual residence in South Carolina entitled her to the remedies afforded by the courts of that State, for her personal security, and to the provisions usually made by those courts for maintenance consequent upon the husband's ill-treatment while domiciled within their jurisdiction, *provided*, the court could acquire jurisdiction over the husband.

   5. That the husband, by answering the bill without objecting to the jurisdiction of the court, will be held to have waived his right to make the objection, and to have conceded to the court the right to proceed.

5. A decree for maintenance to the wife, rendered by the Court of Chancery in South Carolina, where no divorce is by law allowed, to continue until the reconciliation of the parties or the death of either one of them, cannot be enforced in this State against the husband who has subsequently obtained a valid decree of divorce in the courts of this State, *except* for the amount due upon the decree at the time the decree of divorce became effectual. But as to this amount, the subsequent decree of divorce is no estoppel, although the main allegations of the bill upon which the divorce is founded are in conflict with the allegations contained in the wife's bill for maintenance.

6. In a suit upon a judgment or decree of another State, no interest can be allowed unless proof is made of the law prescribing the rate of interest in that State.

7. The Appellate Court cannot judicially notice the table showing the rate of interest in the several States, required by law to be appended by the Secretary of State to the published acts of the Legislature. It must be offered in evidence in the primary court, that the opposite party may have an opportunity to contest its correctness.

ERROR to the Circuit Court of Dallas.

Tried before the Hon. E. Pickens.

This was an action of debt by Harriet Harrison against Margaret Harrison and Francis A. Saunders, the personal representatives of Kirkland Harrison, deceased, to recover from them, as such representatives, the sum of fifty-five thousand dollars, upon a decree of the Chancery Court of Fairfield District, in the State of South Carolina.

The case was submitted in the court below upon an agreed state of facts, and the pleadings were considered as made up to suit the facts thus agreed on, so as to present every legal question which could properly arise out of them. It was further consented, that the legal remedies of the parties should be finally and conclusively determined upon the statement of facts submitted, saving the right to bring the case to this court.

These facts are substantially as follows:

That the plaintiff, whose maiden name was Harriet Ellison without the addition of any middle name, was married to Kirkland Harrison, by that name, in 1828, in the State of South Carolina where the parties then resided, and continued to reside until 1834, when they removed from that State into Dallas county, Alabama, where they permanently settled. Harriet, the plaintiff, remained in Dallas county three or four months, and then returned to the residence of her mother in the State of South Carolina, where she has remained ever since; but Kirkland Harrison never returned to South Carolina after his removal, having continued to reside in Dallas down to the period of his death.

After the plaintiff's return to the State of South Carolina, viz: in 1835, she exhibited her bill in equity in Fairfield District against her said husband, in which she alleged:

1. Their marriage on the 18th March, 1828, in said District of Fairfield, and her removal to his house.

Harrison and Saunders v. Harrison.

2. That shortly thereafter he became changed in his deportment towards her; unnecessarily absenting himself from home, leaving her unprotected; distant in his manner and harsh and offensive in his language, inducing her thus to expect from him nothing but insult and injury. That some four years after her marriage, his conduct became such, by reason of his threats, abusive language, repeated personal violence to her, and an attempt to ruin her character, that her parents came on a visit to the residence of her husband, and took her home with them to protect her against such ill-treatment.

3. That he afterwards visited her, and upon his solemn assurances of amendment, she returned with him to his residence, when he treated her without violence, but without any fixed sentiment of kindness.

4. That in 1834 they removed from South Carolina to Selma, Alabama. While on the way, said Kirkland relapsed into his former habits of harshness and cruelty, insulting and abusing her, and committing violence upon her by striking her in the mouth, and threatening to throw her into the river. That such treatment, coupled with her delicate condition as to health, rendered her situation arising from terror and distress of mind indescribable. That having arrived in the month of May at Selma, and finding her said husband bent on a fatal perseverance in his course of injury and insult towards her, and that her happiness did not in any manner enter into his views, as was manifest from the fact of his abandoning her bed, and taking to his embrace a negro woman belonging to him, with whom he slept in regular companionship, and meeting with an opportunity of quitting his home, she did return in company with her brother to the residence of her parents in South Carolina. That on her return, in the month of June, she availed herself of the hospitalities of a near kinsman in the State of Georgia, where she was delivered of a female child, which she alleged was still with her.

5. That said Kirkland had made no provision for the support of either her, or her child. That he had received from her father, on their marriage, property amounting in value to over two thousand dollars, which had since greatly increased, and which, or the proceeds thereof, he then held. That he had property in Alabama of very considerable value, and also

three negroes in Fairfield District in South Carolina, in the possession of one Morris, who was made a party to the bill, and that David Harrison and Richard Whitaker were indebted to said Kirkland, &c.

6. That said Kirkland has threatened to come into South Carolina, and take her and her child by force back to Alabama.

7. The bill prays for alimony by way of separate maintenance out of the estate of Kirkland Harrison, and that the complainant and her infant be protected in living separate and apart from her said husband, &c.

On the 6th February, 1836, Kirkland filed his answer to this bill, which was taken before commissioners appointed for that purpose. He very positively denies the allegations of the bill, and insists that upon the merits, no decree should go in favor of his wife; alleges his readiness to support her and his infant child at his residence, and prays that letters which he has written to her since her separation from him, making proposals for her return and comfort, may be produced. He however raises no question by his answer as to the jurisdiction of the Court of Chancery of South Carolina, to decree alimony under the facts alleged in the bill.

Proof having been taken, and the bill, answer and depositions being submitted for final decree, the Chancellor (Harper) proceeded to decree: "That the complainant be protected in living apart from her said husband, and in possession and charge of her infant child, and that Kirkland Harrison be enjoined from any attempt to molest or control said complainant, or to deprive her of the possession and charge of her said infant child; that it be referred to the commissioner to inquire and report the entire value of the property owned by the said defendant, and the amount of his annual income, and that one third of the nett income be paid by the defendant to the complainant quarter annually in advance, for her maintenance; and that said commissioner inquire and report what would be a reasonable and proper allowance for the support and maintenance of said infant child, and that the amount reported be annually paid in like manner (by quarterly payments in advance,) to the complainant, in addition to the allowance for her own maintenance. The complainant to be at

liberty at any time to apply to the court for further direction with respect to the maintenance of herself and her child; and that the orders previously made in the cause by the Chancellor (Johnson) remain of force and be carried into effect until the further order of the court. The defendant to pay the costs." Signed by the Chancellor.

This decree is not dated.

The commissioner having ascertained and reported on the 17th day of January, 1837, that Kirkland Harrison's property amounted in value to about seventy-five thousand dollars, and that his annual income amounted to eight thousand five hundred dollars, and also, that one hundred dollars per annum was sufficient for the support of the infant child, the report was confirmed by the Chancellor on the 18th April, 1837.

On the 10th July, 1837, a further decretal order was made requiring the commissioner to sell the three slaves mentioned in the bill, which under a previous order had been placed in the possession of complainant's next friend; which order of sale was complied with, and the negroes sold for $730, on the 2d day of October, 1837, and the proceeds applied to the payment of the decree.

Afterwards, on the 28th June, 1838, the commissioner, to whom it had been referred to ascertain and report the amount due the defendant Kirkland Harrison from Daniel Harrison and Richard L. Whitaker, reported that he had found in their hands the sum of seven thousand one hundred and twenty-four dollars which amount he had received and paid over on the 25th day of September, 1837, to Wm. H. Ellison, the next friend of the complainant, Harriet Harrison, in pursuance of the order of the court made at the July term then last past. This report was likewise confirmed by the Chancellor.

It further appears from the transcript of the proceedings had in the Chancery Court of South Carolina, that on the 11th day of July, 1837, an order was made allowing the complainant as alimony, *pendente lite*, the sum of four hundred dollars, commencing from that date. It is stated in the agreement of facts that the commissioner in equity for Fairfield District proves that about $800 of Kirkland Harrison's property was attached in the Chancery suit in South Carolina, and that

this property was sold and realized that sum, and that such payment was made shortly after the decree was rendered.

The depositions of Messrs. Pettigrew and Hayne show, that the courts of South Carolina exercise jurisdiction over the subject of alimony, and in providing for the protection and separate maintenance of the wife, when the conduct of her husband is such as to call it into exercise.

After these proceedings were had in the State of South Carolina, to-wit: in 1839, the said Kirkland Harrison filed a bill for a divorce *a vinculo matrimonii*, in the Chancery Court of Dallas county, against his then wife, Harriet Harrison, naming her in the bill "Harriet Y. Harrison, formerly Ellison." The ground for divorce asserted by the bill, was the voluntary abandonment of the complainant by the defendant, for more than three years. No mention was made in the bill of the proceedings had in the Chancery Court in South Carolina, and the defendant being a non-resident, publication was made, and a decree divorcing the complainant from defendant was pronounced, upon proof of the allegations, in July, 1841. The record of this divorce was transmitted to the Legislature for its confirmation at the session of 1841-2, but no act was passed divorcing the parties until the 15th day of January, 1844. In this act Mrs. Harrison is called Harriet Y. Harrison.

In 1845 said Kirkland Harrison married Margaret Smith, and had by her one child now living; said Margaret being a party to this suit as his administratrix, he having departed this life in January, 1850.

The foregoing are substantially the facts, and the parties respectively consent in writing, that the decision of the cause and the judgment to be rendered upon them by this court be final and conclusive as to the *legal* rights of the parties.

The court below rendered judgment for the plaintiff below for the sum of $32,386 29, from which judgment the defendants below appealed to this court.

LAPSLEY & HUNTER, for plaintiffs in error:

We maintain, 1st. That the South Carolina decree is wholly void for want of jurisdiction over the subject matter. The fact that Harrison put in his answer without objection

to the jurisdiction, cannot obviate the objection for want of jurisdiction of the subject matter, nor preclude his representatives from raising the objection. It is well settled that even express consent cannot give jurisdiction. See Wyatt v. Judge, 7 Porter 37; Merrell v. Jones, 8 ib. 554; Holcombe's U. S. Dig. pages 424, 425, 426, § 1, 6, 9; Elliott v. Peirsol, 1 Peter's R. 340; Hickey v. Stewart, 3 How. U. S. Rep. 750 and 762; 2 Kent's Com. 457; Mills v. Brown, 16 Peters 525; Story's Con., page 23, § 23; Hanover v. Turner, 14 Mass. 227.

What was the subject matter of the South Carolina suit? It was the marriage relation between the parties; it was not a mere civil contract, or matter exclusively personal as between themselves, but was the most sacred and important of all the domestic relations, a relation which, in the language of Judge Story, "is the very basis of the whole fabric of civilized society."

No independent State can, with justice to itself or safety to society, permit so delicate and important a matter as the marriage relation to be controlled or interfered with by a foreign tribunal. Every State has always most jealously maintained an exclusive control, not only over this, but over all the domestic relations. This exclusive and jealously guarded jurisdiction belongs to the State in which the parties have their domicil.

In this case, the domicil of the parties was in Alabama. They both removed and fixed their residence here, and were domiciled here before the departure of Mrs. Harrison from her husband. The wife leaving Alabama could not change that domicil, even as to herself. The husband's domicil is always that of the wife, and it is not in her power to change it. See Story's Conflict of Laws, page 44, § 46, and page 166, § 198. Dorsey v. Dorsey, 7 Watts 350; McGuire v. McGuire, 7 Dana, 181; Barbor v. Root, 10 Mass. 265; Harteau v. Harteau, 14 Pick. 181; Ford v. Ford, 14 Martin 574 to 578; Warrender v. Warrender, 9 Bligh. 89, 103 and 104; Glover v. Glover, 18 Ala. Rep. 367; and the decision of this court in Harrison v. Harrison, June Term, 1851.

This position is undeniable, and as a necessary consequence the want of jurisdiction in the court of South Carolina is

equally undeniable. If that court had not jurisdiction, how could it render a valid decree?

Upon reason, we can readily see that it might be ruinous to permit foreign interference with any of the domestic relations; if it may interfere with one of these relations, it may of course with all, and thus not only take charge of the relation of husband and wife, parent and child, guardian and ward, but with equal right of master and slave; and if one State can do it, all can do it. If South Carolina may control or interfere with the relation of husband and wife in Alabama, why may not Massachusetts interfere with that of master and slave? And this reasoning is fully supported by authority. See Dorsey v. Dorsey, 7 Watts 350; McGuire v. McGuire, 7 Dana 181; Story's Conflict of Laws, page 350, § 230, a; besides, our constitution and statutes have taken special and express charge of the marriage relation, and the State has made its own legislature and courts of chancery its depositories of this high and important trust. See Con. of Alabama, article 6 § 13; Clay's Digest, under the heads of Marriage and Divorce.

Should a man and his wife, while domiciled in Alabama, leave the State and obtain a divorce from a foreign tribunal, their domicil remaining unchanged, and return to this State, can it be contended that the decree would be valid here? It certainly would not be valid, but our courts would be bound to consider it a mere nullity. See Jackson v. Jackson, 1 Johns. R. 424; Hanover v. Turner, 11 Mass. R. 227, and cases cited, supra.

No reason whatever is shown why Mrs. Harrison could not have had, if mistreated, as complete redress in our courts as in those of South Carolina. If she had desired, she might still have remained in South Carolina, and have carried on her suit here by her agent or attorney.

But even if the objections urged above should be waived, and it were conceded that the court of South Carolina had the jurisdiction, the Alabama divorce would bar and estop the defendant in error from any recovery on her decree.

A subsequent adjudication always bars a former adjudication; both adjudications are founded on precisely the same fact, to-wit: her abandonment of her husband. Her bill and

decree charge that his bad treatment compelled that abandonment. His subsequent bill, decree and act of the legislature affirm that the abandonment was not caused by mistreatment, but was voluntary on her part. Shall a former adjudication by a foreign court prevail over the subsequent adjudication by our own highest court, confirmed by two thirds of our legislature, in a matter affecting the most important rights of a citizen? We think but one answer can be given to this question, an emphatic negative, and consider no authority on this point necessary.

The last adjudication would not only bar any recovery on the former, subsequent to the rendition of last adjudication, but would bar any recovery whatever; and this would be the case, even if both decrees had been rendered by competent courts in this State. Let us suppose a case. A and B fight. A sues B for assault and battery, and recovers, say one hundred dollars of B; subsequently B brings his action against A for the same assault, and the defendant fails to plead the former adjudication, but permits B to recover and obtain a verdict for, say two hundred dollars. A then attempts to collect his judgment by execution; can any one doubt that B could supersede it and have satisfaction entered, by setting up and proving his adjudication?

But it may be said that this doctrine of estoppel cannot apply in this case, because there is no proof of personal service on Mrs. Harrison. The answer to this objection is obvious. Under our statute, publication is made equivalent to personal service, and by legal intendment we must hold that she had, and received through the publication, actual notice of the suit. The statute expressly provides that a decree, rendered on notice by publication, shall be in all respects as conclusive as if rendered on personal service. See Clay's Digest, page 352, § 44.

Even out of this State the decree of divorce rendered here, to say the least, would be *prima facie* good, and *prima facie* unrebutted by evidence is conclusive. See Planters' and Merchants' Bank v. Borland, 5 Ala. Rep. 351.

In this view it is important to observe, that there is no evidence *aliunde* to show what were the real facts of the abandonment, and we are left to ascertain these facts from the legal

effect of the two records; and Mrs. Harrison, having failed to set up her adjudication against the suit here, and failed to come in and set aside the decree within three years, and now failing to produce any extrinsic evidence to show the real facts, but reposing entirely on her former adjudication, clearly stands concluded and estopped. Independent of this, a divorce decree is a decree *sui generis,* and must, from its nature, when effectual to dissolve the marriage at the place of its rendition, be conclusive of its dissolution everywhere. See 9 Greenl. R. 140; Tolen v. Tolen, 2 Blackford's Indiana R. 407; Mansfield v. McIntire, 10 Ohio R. 27; Page's Law of Divorce quoted at page 298 of U. S. Law Magazine, November No. for 1850; ib. pages 297, 298, 299.

GAYLE & GAYLE, S. F. RICE and BOYCE, *contra:*

1. The bill of Mrs. Harrison in South Carolina is not for cruelty in Alabama merely, but for cruelty in South Carolina, (the place of her marriage,) begun there, continued there, and continued in Alabama. The bill may show something like *condonation* as to the cruelty in South Carolina; but condonation is forgiveness, with an implied condition that the injury shall not be repeated, and that the wife shall be treated with conjugal kindness; and on breach of this condition, the right to a remedy for former injuries revives. Upon this foundation the bill is securely rested, and the jurisdiction of the South Carolina court firmly planted. 2 Greenl. on Ev. § 53; Gist v. Cattell, 2 Desaussure's Eq. R. 54. She never parted with "the remedy of past transgression." Story's Con. of Laws, § 230, *a.*

To deny jurisdiction of the case thus presented by the bill to the Chancery Court of South Carolina, is to deny to that court the power to protect a wife against any and all brutal treatment of her husband, committed in that State, and although the parties married in that State and were citizens of that State when the cruelty occurred; or to deny jurisdiction in such case, is to hold that the flight or removal of the offending husband from South Carolina, he taking with him his injured wife, will *oust* the courts of that State, of the jurisdiction which it had until such flight or removal. It is to hold, that the Courts of Equity of that State are rendered powerless

to afford relief to the injured wife, by fraudulent and voluntary act of the offending husband; an act, too, which appears to have been performed with intent to separate her from her native home and her acquaintances and relations, and to make his power more absolute and despotic over his victim. Glover v. Glover, 18 Ala. Rep. 371; Glover v. Glover, 16 Ala Rep. 440; Smith v. Beavers, 11 Ala. Rep. 20; Priest v. Cummings, 16 Wend. Rep. 20; Shanks v. Dupont, 3 Peters' Rep. 242.

Protection and allegiance are reciprocal, they must exist together. The incapacities of *femes covert* do not reach their political rights, nor prevent their losing or acquiring a national character. Shanks v. Dupont, 3 Peters' 248; Priest v. Cummings, 16 Wend.

The incapacities of *femes covert*, provided by the common law, apply to their civil rights only, and are for their protection and interest. (See cases above cited.) And whenever the conduct of the husband is such, that the continuance of these incapacities is not for the "protection and interest" of the wife, and that he is attempting to avail himself of these incapacities of his wife to injure and oppress her, the courts will hold that her capacities to contract and to sue are restored; and in such case, she may leave the State where her husband resides, and enforce her rights in another State; especially in the State of her original or native domicil. Roland v. Logan, 18 Ala. Rep. 307.

A married woman abused and maltreated by her husband may have her residence (or domicil) in one State, (Virginia,) whilst her husband's residence or domicil is in another, (Alabama.) Such was the case in Glover v. Glover, 18 Ala. Rep. 367.

Why did not the husband in his bill for divorce ask for a perpetual injunction against the decree in South Carolina? Suppose he had, could the court in Alabama, even in a direct proceeding, enjoin it? It is said by defendant that it can be done indirectly in this action of debt!

It is a fallacy, to suppose that the exercise of jurisdiction to decree to a wife alimony or separate maintenance, is the assumption of jurisdiction over the relation of husband and wife. This case furnishes a striking illustration of the differ-

ence. The courts of South Carolina avow that they have no jurisdiction over that relation; that is, they cannot annul or destroy that relation; that they cannot grant a divorce, either *a mensa et thoro* or *a vinculo matrimonii*. But recognizing the relation of husband and wife as indissoluble by them, the courts of that State will protect the wife against the brutality of her husband, by decreeing to her a separate maintenance; the cause of action in such suit, is the refusal of the husband to perform the contract which the law imposes on him, of maintaining and supporting his wife, and ill usage of her by him. Anonymous, 2 Dessaussure's Equity Rep. 199, 201, 202; Iclincan's case, ib. 45.

Laws passed or remedies allowed to protect slaves even against the cruelty of their masters, have never been supposed to interfere with the relation of master and slave, or to give the courts jurisdiction of that relation. So laws and remedies for the protection of a wife against the ill usage of her husband do not interfere with the relation of husband and wife.

The wife having brought suit in the proper court in South Carolina against her husband for his ill usage, and having proved her cause of action, and obtained a decree for certain annual sums of money until one of the parties dies, the subsequent application of the husband for a divorce *a vinculo* in Alabama and the decree therein cannot amount to a reversal or limitation, either total or partial, of the former decree in South Carolina. Leavitt v. Smith, 7 Ala. Rep. 175.

In the application of legal principles, we must look to other principles, and so apply them that the whole may be in harmony and consistency. This is illustrated in Verdier v. Hyrne, 4 Strobhart's Law Rep. 470.

Now the decree in South Carolina and the decree in Alabama may be harmonized. Each is on a totally different subject matter; each had a totally different object. The latter decree was not intended to affect, in any way, the former decree. It was not intended to take away from the wife any sum of money which had, during the coverture, been formerly adjudged to her by any court of competent jurisdiction; it was not intended even to decide that she was not to have any interest in her husband's estate after the divorce. The whole

effect of the decree of divorce is, that the marriage relation was dissolved from its confirmation by the legislature, and that the husband could not afterwards be charged with the performance of the obligations. See the decree of divorce itself.

The judgments of courts of sister States are not inferior to simple contract debts, 5 Johns. Rep. 132; they are of higher grade than a speciality. Keith v. Estill, 9 Porter 669. Suppose the husband had, during the coverture, entered into a valid, simple contract, to pay an annual sum of $3000 to a third person as trustee for his wife, until he or his wife died, unless, in the meantime, he and his wife became reconciled, would his subsequent divorce affect the contract? Whatever effect the decree, in favor of plaintiff, would have in South Carolina, must be accorded to it here. Mills v. Duryee, 7 Cranch, 484.

Although it may be true, that after a divorce granted to the husband the wife cannot, by bill in chancery, recover a separate maintenance or alimony, yet, if, before application for such divorce, she has, by the judgment of a competent court, recovered a separate maintenance to be paid annually to her, until either she or her husband dies, or until they are reconciled, such recovery cannot be defeated, either totally or partially, by any subsequent act of the husband, or of a different court at his instance, except the acts contemplated by such recovery, to-wit: his death or his reconciliation with his wife.

Where a recovery of a competent court expressly provides, that after the happening of either one of three certain named contingencies, (to-wit: 1st. The death of the wife; 2d. The death of the husband; 3d. Reconciliation of the husband and wife,) nothing more shall accrue on such recovery, no other court on earth can add a fourth contingency, (to-wit: Subsequent divorce a vinculo,) after the happening of which nothing further shall accrue on such recovery.

The courts of Alabama cannot add to, or amend the decrees of the courts of a sister State, nor exercise appellate power over them, nor reverse or annul them, either totally or partially, unless a want of jurisdiction or fraud in the courts of the sister States is shown.

The foregoing views proceed on the concession, for the sake of the argument, that the decree of divorce is not void. But this concession is wrong, for that decree is void.

The application by the husband for the divorce is not a proceeding *in rem*, but *in personam*. The principle is universal, that a proceeding *in personam* is void, unless either actual notice or constructive notice is given to the party to be affected thereby. McCurry v. Hooper, 12 Ala. Rep. 826; Kilburn v. Woodworth, 5 Johns. Rep. 40; Puckett v. Pope, 3 Ala. Rep. 552. No actual notice was given to the defendant in the suit for divorce.

The question then comes to this, was constructive notice of that suit given to her? The constitution of Alabama declares that divorces *a vinculo* "shall not be granted, but in cases provided for by law, by suit in Chancery."

The only law providing for such suit against a non-resident prescribes the form of procedure in giving constructive notice. It says, "Order of publication shall be made as in other cases of non-resident defendants, except that the order shall succinctly state the object of the bill." Clay's Dig. 170, § 5.

The proof in this cause shows positively that this law has not been followed, but has been palpably disregarded! The law said that an "order of publication, succinctly stating the objects of the bill," should amount to constructive notice to defendant; but no law of Alabama accords to any other kind of order of publication, in a suit for divorce, the effect of constructive notice. No constructive notice has been given; no actual notice has been given; yet a divorce has been granted against a non-resident. No law has provided for the granting of a divorce against a non-resident, on such an order as shown in this suit; and the Constitution restricts the power and jurisdiction of the Chancery Courts of Alabama to "cases provided for by law." The statute passed in pursuance thereof gives the power to decree divorces, with this restriction, "in the manner prescribed by law, and in the following cases." Clay's Dig. 170, § 3. This restriction contained in the Constitution likewise extends to the power of the legislature in its action on a decree for divorce. The legislature has no power to act upon cases "provided for by law;" and according to the laws in existence the legislature had no pow-

er to confirm a decree of divorce, if it was presented and not confirmed, "within and during the ensuing session" next after the decree for divorce. Clay's Dig. 171, § 10.

If the legislature, at its first session, when the decree was presented, did not confirm it, but laid it on the table; that was either a rejection or in the nature of a discontinuance, and no power existed afterwards to confirm it.

CHILTON, J.—We have listened with much attention to the able arguments of the respective counsel engaged in this cause, and have carefully examined the several positions and numerous authorities submitted by them, and having given to the case the consideration which the novelty and importance of several of the questions involved in it demand, it is made my duty to announce, as briefly as I may, the conclusions attained by the court.

1. The first and most important inquiry is, had the Chancery Court of the State of South Carolina jurisdiction to render the decree here sued upon. If it had not, an end is at once put to the case.

No principle of law appears to be more generally recognized, or better established by judicial decisions, than that the domicil of the husband determines that of the wife. Mr. Phillimore, in his work on Domicil, (p. 27,) says: "The maxim of the Roman and continental civilians, as also of this country and America, is, that as the wife takes the rank, so she does the domicil of her husband."

Judge Story, in his work on the Conflict of Laws, § 46, says: "A married woman follows the domicil of her husband. This results from the general principle, that a person who is under the power and authority of another, possesses no right to choose a domicil."

In legal contemplation, husband and wife constitute one body, and cannot be domiciled in different States, so long as the relation upon which their legal identity depends, remains unimpaired. Dougherty v. Snider's Ex'r. 15 S. & R. 84, 90.

2. Applying this well established rule of law to the case before us, it is quite clear, that upon the removal of Kirkland Harrison and the plaintiff below, who was then his wife, from the State of South Carolina, and their permanent settlement

in Dallas County in this State, the latter place became their domicil, and that the return of the wife to the place of their former residence in South Carolina, within a few months after their removal to this State, in no wise operated to change that domicil. At the time Mrs. Harrison filed her bill in the Chancery Court of Fairfield District, in the State of South Carolina, her *legal* domicil was in this State, although she resided in that, which was her matrimonial as well as *actual* domicil.

In Donnegal v. Donnegal, 1 Ad. Ecc. Rep. 19, it was said that a party may have two domicils, the one actual, the other legal, but that the husband's actual and the wife's legal domicil are one, wheresoever she may be personally resident. See also Shackell v. Shackell, and Warrender v. Warrender, cited by Mr. Phillimore on Domicil, p. 81.

Having shown that, at the time of the exhibition of the bill by Mrs. Harrison, both she and her husband were legally domiciled in this State, it remains to consider whether, conceding this fact, the jurisdiction of the court as respects the subject-matter of the bill attached, and what effect the actual non-residence of Kirkland Harrison had upon its power to proceed.

3. It is insisted, on the part of the counsel for the appellant, that the subject-matter of the South Carolina controversy was the marriage relation existing between these parties. They contend, that upon the removal of the parties to this State they brought with them that relation, and that the duties and obligations imposed upon them as springing out of it, not only as affecting themselves and their family, but also as affecting society with which they stand connected, must be under the sole regulation and control of our own law, and not the law of a foreign jurisdiction.

Now, it is most unquestionably true, that no independent State could for a moment tolerate any interference on the part of a foreign tribunal with this, the most sacred and important of all the domestic relations which obtain among its citizens. It is a relation, the intermeddling with which involves consequences most usually reaching far beyond the immediate parties to it, as it lies at the very basis of civilized society, and becomes so interwoven with its very framework, as to

Harrison and Saunders v. Harrison.

render it the peculiar object of exclusive control, by the laws and tribunals where it exists. So that, had the State of South Carolina attempted to annul the marriage, it is very clear the subject-matter, the marriage relation, being without the jurisdiction of that court, its sentence would have been utterly void, and no consent could have given it jurisdiction; for the rule is too well settled to admit of any doubt, that consent in such case cannot confer jurisdiction. 2 Bacon's Abr. (Bouv. Ed.) 618; Wyatt v. Judge, 7 Por. R. 37; Merrill v. Jones, 8 ib. 554–6; McCall v. Peachey, 1 Call, 55; Lindsay v. McClelland, 1 Bibb, 263; Brown v. McKee, 1 J. J. Mar. 476; see also Story's Conf. of Laws, § 230, a.

In the case of Hanover v. Turner, 14 Mass. Rep. 227, which was an action of assumpsit against the husband for necessaries furnished the wife, who had, by his cruel treatment, been forced to abandon him, the husband pleaded that he had obtained a divorce from his wife anterior to the furnishing of the supplies to her; but it appeared he had gone to Vermont, and resided temporarily in that State for the purpose of obtaining a divorce, the wife never having been within that jurisdiction, and that the alleged ground of divorce took place in Massachusetts, the State of their permanent domicil. The court held the divorce granted by the Vermont court utterly void, and said : "If we were to give effect to this decree, we should permit another State to govern our citizens, in direct contravention of our own laws, and this can be required by no rule of comity." Such is undoubtedly the correct rule of law, and we recognize it to the fullest extent; but upon a calm and careful review of the facts of this case, we feel constrained to hold that they do not bring it within the influence of this principle.

4. In this case the parties were married in South Carolina, and resided permanently there for several years, and assuming the jurisdictional facts stated in the bill to be true, as we must when the judgment or decree is collaterally attacked, it appears the husband, while domiciled in that State, by his improper conduct towards the wife, furnished her the cause of complaint, which is made the ground of the relief afforded by the decree now sued upon.

While resident there, a separation took place, by reason of

his mal-treatment, and Mrs. Harrison was induced to return to him, upon his promise of amendment and future kind treatment. This promise he failed to redeem, and by his failure deprived himself of the benefit of the intervening pardon or condonation of the wife. She became thereupon remitted to her original remedy afforded by the tribunals of that State, for the cruelty and abuse inflicted upon her. Condonation is accompanied with an implied condition that the injury shall not be repeated, and that the repetition of the injury takes away the condonation, and operates a revivor of former acts. Durant v. Durant, 1 Hagg. Ecc. Rep. 761; ib. 781; ib. 130; Shelford on Divorce, 446, mar. p. Besides, this doctrine of forgiveness as a bar, is not presumed so readily against the wife as the husband, for it is esteemed both legal and meritorious for her to be patient under her suffering, stimulated by the hope that by her meek and proper deportment toward her husband she may win him back to a sense of duty, and produce in him a reformation. Forbearance, therefore, to abandon him and sue, does not weaken her title to relief. Durant v. Durant, supra; Shel. on Div. 448.

It is very clear that, according to the facts of the case presented by the record of the wife's recovery in the Chancery Court of Fairfield District, she had a right, before her removal to this State, to relief against her husband, according to the law as administered in the Chancery Courts of South Carolina. That relief would not extend to annulling the marriage, for it appears that divorces are never granted in that State; but it extends to the protection of the wife, and a provision for herself and infant child, by way of maintenance or alimony, to continue until the husband is willing to take his wife back and treat her with conjugal affection. The marriage remains of force notwithstanding the decree, and the husband is shorn of his power to inflict further injury upon his wife, whom, by his bad conduct and ill treatment, he has driven from his house. Although her legal domicil was in Alabama, yet she was *actually* resident in South Carolina, and as such, entitled to the protection afforded by the laws of that State. Had her husband gone there and attempted violence upon her, or by force to take her out of that jurisdiction, so as to continue his cruel treatment towards her, we entertain no doubt as to

the powers and jurisdiction of that court to restrain him, and to grant the relief usually afforded in such cases. He was subject to be proceeded against before he left, and being found within the jurisdiction, even temporarily, the wife could enforce against him her claim for maintenance, while the court would provide for her protection by restraining him from molesting her. The question of legal domicil would interpose no obstacle in such case; for when it is necessary to the protection of the wife against the actual or threatened injury of the husband, the law (and much more will equity) pretermits the legal fiction of their unity. It is upon this principle that she may give evidence against her husband when prosecuted for injuries inflicted upon her, and compel him to find sureties for the peace. 1 Greenl. on Ev. §. 343.

The transfer of their domicil to this State does not destroy the wife's right to proceed in South Carolina, for a ground of complaint complete in that State before their removal, provided the parties can be subjected to that jurisdiction by being personally served with the process of the court.

In Dorsey v. Dorsey, cited by Mr. Justice Story in his Conflict of Laws, § 230 a, Mr. C. J. Gibson, after stating that the transfer of allegiance and domicil is a contingency which enters into the views of the parties when they contract marriage, and of which the wife consents to bear the risk, proceeds to say, that "by sanctioning this transfer beforehand, we consent to part with the municipal governance incident to it; *but with this limitation, we part not with the remedy of past transgression.*"

It follows, therefore, that unless there was a want of jurisdiction as to the person of the defendant, the South Carolina decree is valid, since it does not annul or attempt to impair the relation of marriage, but only affords a remedy for the violation of obligations, and seeks to enforce duties growing out of that relation.

Upon the subject of the jurisdiction as affected by the non-residence of Kirkland Harrison, a few words may suffice. Conceding that he might have availed himself of his residence in this State to have defeated a recovery, we think it clear that his failure to raise the objection must be regarded as a waiver of it. The rule appears to be well established, that

where the court has jurisdiction of the subject-matter, and the party is privileged from its jurisdiction, he may waive such privilege. 2 Bacon's Abr. by Bouvier, 618, and authorities there cited. It is also settled, that pleading to the merits, or submitting to answer without raising the objection to the jurisdiction on account of such privilege, is a waiver of the objection. Daniel's Ch. Pr. 715; Story's Eq. Pl. § 721, and cases there cited.

These considerations lead us to the conclusion, that the decree sued on is not void for want of jurisdiction.

5. But it is strenuously urged that, conceding the Chancery Court of Fairfield District had jurisdiction to render this decree, the divorce which the husband subsequently obtained from the plaintiff below, operates a complete bar to her recovery. On the other side, it is replied, that the divorce is void for want of jurisdiction over the person of the wife; or that, conceding it to be valid, the previous decree in South Carolina having determined upon the death of one of the parties or their reconciliation, as periods when the provision for the wife's support should cease, the Chancery Court of this State could not add to that decree, by holding the provision should cease upon their divorce.

We shall not stop to inquire whether this divorce was regularly obtained, and was binding upon these parties. That identical question was before us at a previous term of this court, and after a full examination, we determined that the decree was not void. The subsequent argument of the point, and the additional grounds taken, have failed to shake our opinion in the correctness of that decision.

But although that decree was predicated upon the ground of the wife's abandonment of her husband, we think it by no means follows that it estops the wife, from recovering the amount decreed before its rendition as a provision for her support. No case has been cited, and we have been unable to find one, which holds, that a subsequent decree of divorce has the effect to vacate and avoid, in this indirect manner, a moneyed decree previously rendered, as to the amount due upon it anterior to the divorce. To hold that the decree of divorce should have the effect of vacating the previous decree for the alimony due anterior to its rendition, would be to al-

low the party to do indirectly, what he could not have accomplished by a direct proceeding.

We are of opinion that both decrees may stand, so far as in their results they are not incompatible with each other. The subject-matter and object of each are wholly different. The first seeks to enforce the obligations and duties springing out of the relation of marriage; the second, entirely to annul that relation, and having effected the contemplated object, puts a period to the operation of the first, which is necessarily dependent upon that relation. True, the South Carolina court, not recognizing the doctrine of divorce, did not fix upon that as a period terminating the provision made by its decree for the wife; but when she seeks her remedy in this State, where divorces are granted, she submits to the law of the *forum* governing that remedy; and as by this law an end has been put; to the relation of marriage, as effectually as would have resulted from the death of either of the parties, as a consequence, all duties and obligations necessarily dependent upon the continuance of that relation, immediately cease.

After the best reflection we have been enabled to bestow upon this case, we come to the conclusion, that the plaintiff below is entitled, according to the decree which is the foundation of her action, to recover one-third of the nett annual income of her late husband, estimated to have been annually, $8,500, from the 18th day of April, 1837, down to the time of the divorce, which was the 15th January, 1844, embracing a period of seven years, less three months and three days.

The judgment of the Circuit Court, which is based upon an extension of the period to the death of the husband, is clearly erroneous, and must be reversed; and judgment must here be rendered for the correct amount, which is computed as follows: One-third annual income from 18th April, 1837, to 15th January, 1844, say six years and nine months, less three days, is $19,101 $\frac{38}{100}$; from this sum must be deducted the sum of $730, the proceeds of the sale of the slaves, and also the sum of $7, 124, the moneys collected by the Commissioner from Messrs. Harrison and Whitaker, and paid to the complainant in South Carolina, leaving the amount for which judgment must be here entered $11,247 $\frac{38}{100}$.

6 and 7. It is settled, that in the absence of evidence as to

41

the interest law of another State, none can be calculated; neither can this court judicially know the interest allowable in South Carolina, from the table required to be appended by the Secretary of State to the published acts of the Legislature. This point has several times been decided by us. Such evidence should have been offered in the primary court, that the opposite party might have controverted it, had he seen proper to do so.

Let the judgment be reversed, and accordingly rendered, to be levied of the goods and chattels of the intestate in the hands of the plaintiffs in error unadministered, and let the plaintiffs in error recover their cost.