PEARSON AND WIFE vs. DARRINGTON.

[BILL IN EQUITY FOR SETTLEMENT OF ADMINISTRATION.]

1. *Exceptions to master's report.*—Where the master's report is accompanied with an abstract of the testimony relating to some of the items of account, but simply states that other items were proved, without setting out the evidence relating to them; and exceptions are reserved to the allowance of these latter items, but not to the insufficiency of the evidence on which they were allowed by the master, nor to his failure to set out that evidence, they must be deemed to have been established by sufficient evidence, unless the contrary appears.

2. *When maintenance of widow not chargeable to estate.*—An administrator will not be allowed a credit, on settlement of his accounts in equity, for moneys

paid to or for the testator's widow, when it is shown that she dissented from her husband's will, and was excluded by it from all participation in the estate while kept together by the administrator.

3. *General exception to credit partly legal.*—A general exception is sufficient to exclude an entire voucher which is partly legal, unless the administrator (or other party claiming the credit) furnishes the means of distinguishing the legal from the illegal portion.

4. *Husband's liability for necessaries furnished to wife.*—The husband is liable for necessaries furnished to the wife, while living separate and apart from him by voluntary agreement, if the allowance which he makes for her is not suitable to his fortune and condition in life ; but, if the articles are bought on a credit, and are charged to the wife, this is sufficient, at least *prima facie*, to show that the credit was given to her, and not to the husband.

5. *Ex-parte affidavits.*—Ex-parte affidavits may be received as evidence by the master, on a reference, unless objection is made to them.

6. *Sufficiency of proof to entitle administrator to credit for payment of debt.*—Evidence which would be sufficient to authorize a recovery against an administrator, in an action at law by a creditor of the intestate, is sufficient to entitle the administrator, on settlement of his accounts, to a credit for the payment of the debt.

7. *Admissibility of defendant's answer as evidence against co-defendant.*—In stating an account before the master, the answer of one defendant cannot be used as evidence against another, whose interest is adverse to his.

8. *Commissions paid for advancing and accepting not allowed as credit to administrator.*—An administrator, while keeping an estate together under the directions of the will, has no authority to raise money by acceptances and advancements by commission-merchants, unless some peculiar circumstances of the trust require it ; consequently, he is not entitled to a credit, on settlement of his accounts, for commissions paid on account of such acceptances and advancements.

9. *Costs of suit against administrator allowed.*—An administrator will be allowed a credit, on settlement of his accounts, for costs of suit paid under a judgment recovered against him by a creditor of the intestate, when it does not appear that, in failing to pay the debt without suit, he was guilty of any negligence, bad faith, or other improper ʻconduct : in reference to such matters, much must be left to the discretion of the administrator.

10. *Liability of joint administrators for acts of each other.*—Where two administrators give a joint bond for the performance of their duties, each is liable for the acts and defaults of the other, unless the bond itself shows that they did not intend to become so bound.

11. *Liability of administrator for negligence in defending suit.*—An administrator is chargeable with the amount of the proceeds of the sale of cotton, shipped by the intestate in his lifetime to meet a note held by a foreign creditor, on proof that he suffered a judgment to go against him, in favor of such creditor, for the entire amount of the note, when there was among the intestate's papers a letter from the creditor, which showed that, after deducting the amount due on the note from the proceeds of the sale of cotton, there was a balance in the intestate's favor.

12. *Hearsay not competent evidence, though declarant be dead or absent.*—Declarations, verbal or written, which are mere hearsay, are not rendered competent evidence by the fact that the declarant has since died or left the country.

13. *Validity of decree of orphans' court against personal representative of foreign administrator.*—A decree, rendered by an orphans' court of this State, against the domestic personal representative of a foreign administrator, in favor of the "legatees" of the foreign intestate, is void, for want of jurisdiction of the subject-matter.

14. *Money paid under void decree not recoverable.*—An administrator is not entitled to a credit for money paid by him under a void decree, when it is shown that he had constructive notice of the existence of a complete defense against it.

15. *Allowance by chancellor of wife's counsel fees in divorce suit.*—In a divorce suit, instituted by the wife, the chancellor may require her husband to pay her counsel fees; but, where the bill also seeks the enforcement of a marriage-settlement, and, on the death of the husband, is revived against his personal representative, an order for the allowance of the wife's counsel fees cannot afterwards be made, since the death of the husband abates the suit so far as it seeks a divorce.

16. *Liability of husband for wife's counsel fees as necessaries.*—Neither the husband nor his administrator can be charged in an action at law, as on an implied contract, for the wife's counsel fees, incurred in a suit instituted by her for a divorce and the enforcement of a marriage-settlement.

17. *Agent's compensation not allowed as credit to administrator.*—An administrator has no authority to appoint an agent at any particular place, to receive claims against the estate, give receipts, &c.; consequently, he will not be allowed a credit for compensation paid to such agent.

18. *Proof of account.*—An affidavit of the fact that an account was made out by a book-keeper, since deceased, is not, of itself, sufficient proof of the correctness of the account to entitle an administrator to a credit for its payment.

19. *Repairs of carriage allowed administrator.*—An administrator is entitled to a credit for the payment of an account for repairing a family carriage, which the condition of the estate authorized him to retain for the use of the testator's family, while keeping the estate together under the directions of the will.

20. *Sufficiency of subsequent promise to revive debt barred by statute of limitations.* Where the debtor, on being reminded by a third person of a promise, made by him many years before, to pay the debt when he became able, replied, "that whenever the notes were presented, he would make a satisfactory arrangement; that the payment of the principal ought to be received as satisfactory, and that he wished him to so advise the creditor,"—*held*, that this was not sufficient to remove the bar of the statute of limitations.

21. *Attorney's liability for negligence.*—The failure of an attorney to reserve a bill of exceptions to an erroneous ruling of the circuit court, as to the sufficiency of a subsequent promise to revive a debt barred by the statute of limitations, is not such negligence as would prevent him from recovering his fee from his client.

22. *Same.*—Nor does his failure to be present at the final trial of the suit, deprive him of his right to compensation, when it is not shown that he was employed generally to represent his client's interests in the suit.

23. *Costs of suit allowed as credit to administrator.*—An administrator is entitled to a credit for costs and reasonable expenses incurred by him in an appellate court, to which he removed an action at law after judgment had been rendered against him, and afterwards in equity, where he sought to enjoin the

judgment, when it appears that he acted under the advice of counsel, and finally effected a favorable compromise of the suit.

24. *Same.*—But the commissions of the sheriff or marshal, for collecting the judgment under execution, are not a proper credit, when it is shown that, at the time the execution was issued, the administrator had funds in his hands sufficient to pay the judgment.

25. *Sufficiency of proof to authorize allowance of credit.*—To entitle an administrator to the allowance of a credit for a payment made by him, he must prove not only the payment, but also the correctness of the demand.

26. *Judicial notice of attorney's services as shown by reported argument.*—The appellate court cannot look to an attorney's argument as shown in, the printed reports, and take judicial cognizance of the value of the services rendered.

27. *Re-examination of witness on reference.*—On a second reference, a party has no right, without an order authorizing it, to re-examine a witness whose deposition has been already taken, or who was examined under the former reference; consequently, he cannot complain on error of the action of the chancellor, *ex mero motu*, in directing the master not to re-examine witnesses on the second reference, when it appears that the only material witness rejected on the second reference had been already examined several times, and occupied such a relation to the party that an order for his re-examination ought not to have been granted.

28. *General objection to voucher partly correct.*—The appellate court cannot say that there was error in overruling an objection to an entire voucher, part of which was properly proved.

29. *Sale of decedent's lands by orphans' court.*—Devised lands may be sold, under an order of the orphans' court, (Clay's Digest, 224, § 16,) for the payment of a decedent's debts; and the proceeds of sale will be assets in the hands of the administrator.

30. *General exception to voucher partly correct.*—A general exception to the exclusion of an entire voucher, consisting of several distinct items, some of which are correct, may be overruled.

31. *Waiver of objection to secondary evidence.*—The failure to object to the admission of secondary evidence is an implied waiver of its illegality.

32. *Conclusiveness of judicial decisions.*—When a case is brought a second time to the supreme court on error or appeal, the correctness of the opinion formerly pronounced in it cannot be questioned.

33. *Sale of personalty by order of orphans' court set aside in equity.*—If an administrator obtains an order of sale from the orphans' court, after the settlement of his administration has been removed by the distributees into chancery, and becomes himself the purchaser of a large number of slaves, it is the duty of the chancellor, at the instance of the distributees, to enjoin the removal of the slaves by the administrator, and, on final hearing, to set aside the sale as embarrassing the administration of the estate; and the sale being set aside, the administrator is not entitled to a credit for the hire of the slaves during the time of their retention on the estate under the injunction.

34. *Damages for conversion of slave by administrator.*—Where an administrator is enjoined in equity from removing or disposing of slaves which he had bought at his own sale, made under an order of the orphans' court after the settlement of the estate had been removed into chancery; and, notwithstanding the injunction, afterwards carries off and sells a portion of tnem,—

Pearson and Wife v. Darrington.

he is chargeable, on final hearing, the sale being set aside by the chancellor, with the value of these slaves at the time they were so disposed of by him.

35. *Liability of administrator for devastavit.*—An administrator is chargeable with the value of wood cut from the lands of the estate by the decedent's widow, after she had dissented from the will, without objection on his part, and with the value of the slaves, horses and wagons employed by her in transporting it to market ; and this, notwithstanding an indefinite portion of the proceeds of sale was appropriated by the widow to the benefit of the children.

36. *Interest charged for and against administrator.*—An administrator is chargeable with interest, on settlement of his accounts in equity, notwithstanding he makes the statutory affidavit respecting the use of the funds of the estate, when it is shown that he either appropriated the funds to his own private use, or to some other illegal purpose, or kept them in his hands unemployed while outstanding debts against the estate were drawing interest ; and he is also entitled to a credit for interest on his disbursements.

37. *Compensation of administrator.*—If an administrator is not shown to have been guilty of any willful default or gross negligence, resulting in loss to the estate, he is entitled to the customary compensation ; which is, for services rendered prior to the passage of the act of 1841, five per cent. on the amount of his receipts, and half that per cent. for his disbursements ; and from the passage of the act of 1841 to the adoption of the Code, an annual compensation, to be determined by the labor performed, the responsibility involved, and the value of the estate.

38. *Same.*—An administrator's willful violation of duty, in removing beyond the jurisdiction of the chancellor, notwithstanding the pendency of an injunction against their removal, slaves which he had purchased at a sale under an order of the orphans' court, which sale was set aside by the chancellor, and his failure to comply with a subsequent order requiring him to bring them back again, forfeits his right to future compensation.

39. *Expenses connected with administration.*—An administrator is entitled to a credit for personal expenses, necessarily incurred by him in transacting the business of his trust ; but he must prove the particular items of expense, and cannot claim the allowance of a gross sum without a specification of particulars.

40. *Annual settlements.*—Partial or annual settlements of an administrator's accounts, made prior to the adoption of the Code, without notice to the parties interested, are not evidence for the administrator on final settlement.

41. *Administrator's counsel fees on final settlement.*—An administrator cannot complain on error of the refusal of the chancellor, on final settlement of his accounts at the instance of the distributees, to allow him a credit for counsel fees incurred on the settlement, when it appears that the vouchers presented by him were for his counsel's entire services in the suit, although a great portion of the litigation was the result of his own fault.

42. *Release of administrator by distributes.*—A release, executed to an administrator by one of the distributees of the estate, after the institution of a suit in equity for the settlement of the estate, discharging the administrator from all actions, debts, duties and demands, both at law and in equity, imports a consideration when under seal, and is a complete defense to the

administrator against the rendition of a money decree in favor of such distributee.

43. *Cross bill proper to establish release and set-off.*—Where a bill in equity is filed against an administrator, to compel a settlement of his accounts and a distribution of the estate, a cross bill is the appropriate mode of bringing forward a release, executed to the administrator by one of the distributees after answer filed, and of establishing an equitable set-off against another distributee.

44. *Equitable set-off.*—A cross demand against one of the distributees of an estate, for the conversion of personal property without the consent or sanction of the administrator, is available as a set-off to the administrator, when a bill is filed against him for a settlement and distribution of the estate; but he cannot set off a pecuniary demand for advancements of money against one who, having released the administrator from all pecuniary demands, is only entitled to a distributive share of the personalty remaining *in specie.*

45. *Rejection of creditors' claims against estate.*—Where the creditors of an estate, in progress of settlement in chancery, are required by an order of court to come in and prove their debts, they become *quasi* parties to the cause, and may appeal and assign error on account of the rejection of their claims; but the administrator of the estate, not being injured by the rejection of their claims, cannot complain of it on error.

APPEAL from the Chancery Court of Dallas.

Heard before the Hon. JAMES B. CLARK.

THE original bill in this case was filed on the 22d April, 1847, by Jacob Pearson and Maria, his wife, against John Darrington, as administrator with the will annexed of William Matherson, deceased; charging the defendant with waste, negligence, mismanagement of the estate, misapplication of the assets, &c.; and seeking the recovery of certain legacies bequeathed to Mrs. Pearson by said testator, who was her father, and a final settlement and distribution of the estate. A supplemental bill was filed in August, 1848, alleging that the administrator, after the filing of the original bill, had obtained an order of sale from the orphans' court of Clarke county, by which his letters were granted, under which order he had sold a large number of slaves belonging to the estate, and had himself become the purchaser, by collusion with the auctioneer, at a price much less than their value; and praying that the sale might be set aside, and that the defendant might be enjoined from removing selling, or otherwise disposing of the slaves. In April, 1850, Chan-

cellor Mason dismissed the bill, on motion, for want of equity; but his decree was reversed on error by .the supreme court, at its June term, 1850, and the cause was remanded.—See the case reported in 18 Ala. 348. In December, 1851, after the remandment of the cause, the defendant moved to dissolve the injunction on his answer, and for want of equity in the supplemental bill; which motion was heard before Chancellor Mason, and granted by him; but his decree was again reversed by the supreme court, at its June term, 1852, and a decree rendered reinstating the injunction.—See 21 Ala. 169.

William Matherson, the defendant's testator, died in Clarke county, Alabama, the place of his residence, in June, 1836; being seized and possessed, at the time of his death, of a very large estate, consisting of lands, slaves, bank-stock, and other kinds of property; and leaving a widow and four children surviving him. Neither the widow nor the other children were made parties to the complainants' original or supplemental bill, but they were brought in as parties to a cross bill filed by the administrator. On the 6th February, 1837, the testator's will, which was dated the 2d April, 1836, was admitted to probate by the orphans' court of Clarke county; and the executors therein named having failed to qualify, letters of administration, *cum testamento annexo*, were granted by the orphans' court, on the —— day of ——, 1837, to John Darrington and John Murphy, who thereupon gave a joint bond, and entered on the discharge of their duties. Murphy died in October, 1842, and thenceforward Darrington had the sole management of the estate, which was kept together under the directions of the will.

The testator's will contained the following provisions:

The first clause directed his executors to pay all his just debts, so soon after his decease as might be convenient, out of the proceeds of his crops that might come to their hands.

The second and third clauses devised certain specified lands to his son, William A. Matherson, and to his three daughters, Maria, Flora and Caledonia, all whom were then unmarried.

16

The fourth clause bequeathed to the testator's four children all his personal property, after payment of his debts, specifying it as "consisting of slaves, horses, mules, oxen, horned cattle, hogs, plantation tools, carts and other carriages, either for the use of the plantation or mills; also, all pleasure carriages, household and kitchen furniture of every description, all provisions remaining at my [his] decease, the crops then growing or on hand; also, all cash on hand, bank-stock, all debts due, and all demands of every grade, character, and description; to be equally divided among them, share and share alike, their heirs, executors, administrators and assigns, forever; the division and partition to take place at the time and in the manner hereinafter prescribed."

The fifth clause was in these words: "*Fifth.*—I will, direct, and hereby require my executors, hereinafter to be named, to keep together the whole of my estate, both real and personal, and to work and manage my slaves, and keep them in common on the lands which may be in cultivation at my death, until the 21st day of March, 1842, when my daughter Maria will have arrived at the age of twenty-one years; at which time I direct my executors, hereinafter to be appointed, to divide all my personal property of every description into four equal shares; the one-fourth of which I will and bequeath to my said daughter Maria, to be possessed and enjoyed by her, as mentioned in the fourth clause of this my will. The remaining three-fourths of my said personal estate I direct and hereby require my executors, hereinafter to be named as aforesaid, to keep in common on the said lands, working the said slaves, and managing the same, for the joint use, benefit and interest of my three children, William A., Flora and Caledonia, until the 27th day of November, 1847, when my said daughter Flora will have arrived at the age of twenty-one years; at which time I will and direct my said executors again to divide my said personal estate into three equal shares; one-third of which I will and bequeath to my said daughter Flora, to be possessed and enjoyed by her as mentioned in the fourth clause of this my will; and the remaining two-thirds of my said

personal estate I will, direct and hereby require my said executors, hereinafter to be named as aforesaid, to keep in common on the said lands, working and managing the same for the joint use, benefit and interest of my said son, William A., and my said daughter Caledonia, until the 18th day of October, 1849, when my said daughter Caledonia will have arrived at the age of twenty-one years; at which time I will and direct my said executors again to divide my said personal estate, so kept, into two equal shares, between my said children, William A. and Caledonia; which said shares I will and devise as by the fourth clause in this will directed—viz., one share to said William A., and one to said Caledonia, their heirs, executors, administrators and assigns, forever."

The sixth clause was in these words: "*Sixth.*—I will and devise to my said three daughters, Maria, Flora, and Caledonia, the sum of $30,000, viz., to my daughter Maria $10,000, to my daughter Flora $10,000, and to my daughter Caledonia $10,000; which said sums of money shall be paid out of the proceeds arising from the labor and services of the slaves hereby directed to be kept on the lands, as required by the fifth clause of this my will, in the following manner, and at the following times: my daughter Maria to be paid $1,000 annually, commencing on the 21st day of May, 1840, and ending the 21st day of May, 1850, so that she will receive in that time $10,000 and no more; my daughter Flora to be paid $1,000 annually, commencing on the 27th day of November, 1847, and ending the 27th of November, 1857, so that she will receive in that time $10,000, and no more; and my daughter Caledonia to be paid $1,000 annually, commencing on the 18th day of October, 1849, and ending on the 18th day of October, 1859, so that she will receive in that time $10,000, and no more."

The seventh, eighth, ninth and tenth clauses contained specific legacies of one slave each to the testator's four children, to be possessed by them immediately after his decease.

The eleventh clause directed the executors, after payment of debts and the pecuniary legacies to the daughters,

"to lay out the balance of the proceeds of the crops in slaves, and to work and manage them in common on the lands mentioned in the fifth clause of this will; the slaves so purchased, with their increase, to be divided at the division mentioned in said clause among the children whose slaves may have been in common where the crop was made."

The twelfth clause directs the executors "to educate, clothe and maintain" the testator's four children, out of the proceeds of the crops, "so long as their share or shares may remain in common, as directed by the fifth clause."

The thirteenth clause directed, that if any one of the testator's children should die, without leaving a child or children surviving them, in that event the interest of the child so dying should "survive and pass" to the testator's surviving children.

The fourteenth clause was in these words: "As my wife, Maria Matherson, the mother of my children above named, has left my bed and board without any just cause, and has instituted a suit in chancery against me most unjustly, not only for my whole estate, but also for a divorce *a vinculo matrimonii*, I feel that I am totally discharged from making any sort of provision for her; and if she chooses, she can look to the law against her own children, as she has pursued that course against her best friend and the husband of her bosom."

The last clause appointed the executors of the will, and nominated the same persons as guardians of the persons and estates of the testator's children until they attained their majority or married.

The defendant Darrington answered both the original and the supplemental bill, and afterwards filed a cross bill against all the distributees of the estate, in which he set up a release from Mrs. Matherson, claimed a set-off against her and William A. Matherson, and brought forward other matters which require no special notice. All the defendants filed answers to the cross bill, and, on final hearing, the chancellor dismissed it.

On the stating of the account before the master, every

item seems to have been contested; the complainants excepting to the allowance of every credit claimed by the administrator, who in turn excepted to the rejection of every credit disallowed. The action of the chancellor in reference to these several exceptions, and other matters embraced in his final decree, are now assigned as error; there being forty assignments of error by the administrator, and twenty-nine cross assignments by the distributees. The material portions of the evidence bearing on all these points, being stated at sufficient length in the opinion of the court, need not here be repeated.

WILLIAM & COCKE, for the complainants.

F. S. BLOUNT, and E. S. DARGAN, contra.

WALKER, J.—The chancellor made a reference to a special register, appointed for the purpose, to take and state the account of Darrington, as the administrator cum testamento annexo of the estate of Wm. Matherson, deceased. The special register made a report, to which exceptions were filed on both sides. The chancellor passed finally and conclusively upon some of the exceptions; upon the others he passed with a reservation of the right to show upon a subsequent reference that which would be necessary to authorize a different ruling. The special register accompanies the items of credit by numerical references to vouchers. There is attached to the report of the special register a paper, in which there is a designation of the credits by the number of the vouchers, accompanied by remarks of the register in reference to them respectively. Many of them, those remarks assert without qualification, to have been proved. The special register professes to report to the chancellor all the testimony; and yet he says, in another part of the report, that he had taken testimony as to one item which he does not report. It is also manifest from the remarks of the special register in reference to the different vouchers, that he did not report all the testimony which was submitted to him; for he states that facts were proved, as to which no evidence is found accompanying the report.

The complainants made no ·objection to the report on account of its conflicting statements, or of its omission to set forth the testimony from which the special register deduced any of his conclusions, or of its assertions that various items of credit were proved. The exceptions simply go to the allowance of the credits. The chancellor was not called upon, either by exceptions, or by a motion addressed to him, to decide whether the report was objectionable for its inconsistency, its ambiguity, its omissions to report the testimony upon which many of the conclusions were predicated, or for any incorrect assertion that items of credit were proved. The questions as to the existence of these objections, and as to the proper mode of taking advantage of them, were not presented to the chancellor, and are not to be decided by us. The question raised by the exceptions was, whether the rulings of the special register were correct. His decision as to all those items of credit which he allowed, and which he says in his remarks upon the vouchers were proved, must be deemed to have been established by sufficient testimony, unless the contrary appears; the only question being as to the allowance of the credits. An exception cannot be sustained, unless the truth of it appears upon "the face of the proceedings." It cannot  be presumed that the register's statements are incorrect. They must be regarded as true. "Exceptions are to be regarded so far only as they are supported by the special statements of the master, or by evidence, which ought to be brought before the court by a reference to the particular testimony on which the exceptor relies."—Harding v. Handy, 11 Wheaton, 103, 126; Thompson v. O'Daniel, 2 Hawks' Law and Eq. R. 307; Tyler v. Simmons & Miller, 6 Paige, 127; Dexter v. Arnold, 2 Sumner, 108; Story v. Livingston, 13 Peters, 359; Alexander v. Alexander, 8 Ala. 805; Kirkman v. Vanlier, 7 Ala. 217; Demott v. Benson, Edw. Ch. 297.

The chancellor sustained the exceptions of the complainants to a number of credits, which the special register states were proved before him, and overruled the exceptions of the defendant to the rejection of many of those

same credits by the register upon a subsequent reference, and sustained the exceptions of the complainants to the allowance of several of them by the register upon the subsequent reference. Those credits should have been regarded as established, upon the principle above asserted, when the exceptions to the special register's report were before the chancellor. We decide, therefore, that the chancellor's rulings in sustaining exceptions by the complainants to the allowance by the special register, and afterwards by the register, of credits belonging to the above specified class, and in overruling exceptions by the defendant to the rejection of credits belonging to such class, were erroneous; and that the rulings of the chancellor overruling the complainants' exceptions to the allowance of credits belonging to such class, and sustaining the defendant's exceptions to the rejection of credits belonging to such class, were correct. We subjoin a list of credits, designated by the respective numbers of the vouchers, which were the subjects of the above stated exceptions, and which were either improperly rejected or correctly allowed. The list is as follows, to-wit: Vouchers Nos. 81, 67, 169, 164, 575, and 581, allowed on the statement of the register, and not of the special register; 95, 172, 182, 199, 235, 272, 341, 364, 457, 465, 500, 226, 238, 257, 316, 537, 202, 207, 208, 266, 289, 419, 503, 441, 448, 311, 315, 318, 320, 391, 326, 418, 351, 362, 363, 370, 392, 373, (except as to $6 63 for accepting, as to which the credit was properly rejected,) 383, 463, 384, 397, 406, 458, 435, 542, 562, 40, 83, 122, 162, 262, 299, 547.

[2.] The will of the testator forbids us to conclude that he designed his widow to be maintained, either separately, or as a part of his family, from the estate while it should be kept together. The will in this case differs materially from those which were construed in the cases of McLeod v. McDonald, 6 Ala. 236; Moore v. Moore, 18 Ala. 442, and Travis v. Morrison, 28 Ala. 494. It directs, that the plantation shall be carried on for a specified period; and that the *children* shall be educated, clothed, and maintained, out of the proceeds of the crops, so long as their shares may remain in common. There is not only a significant

exclusion of the widow's name from the clause which provides a maintenance from the crops, but the testator has devoted the fourteenth clause of the will to the manifest purpose of precluding the reception by the widow of any thing as a bounty from him. After giving his reason for so singular a direction, he says: "I feel that I am totally discharged from making any sort of provision for her; and if she chooses, she can look to the law against her own children, as she has pursued that course against her best friend and the husband of her bosom." A purpose is thus carefully expressed by the testator to make his children the sole beneficiaries of the will, and to compel his wife to take whatever she might receive at the hands of the law, and in diminution of the bequests to the children. The construction of the will which seems to have been adopted by the administrator, instead of comporting with, would defeat the testator's intention, and cannot, therefore, receive our sanction.

Besides, the widow, having dissented from the will, could not take a maintenance or anything else under the will. As held by us in McReynolds v. Jones, 30 Ala., she cannot take both under and against the will. So that if the interpretation of the will urged in behalf of the administrator were correct, it would not benefit him.

The widow not being entitled to "*any sort of provision*" under the will, the administrator should not be allowed in the general account of his administration any credit for advancements made to, for, or on account of the widow, or for the contribution of any thing to her maintenance, after the testator's death. Applying this decision to the case, we hold, that the administrator was not entitled to the credits claimed by him which are designated by the numbers of the vouchers as follows, to-wit: Voucher No. 1, 9, 49, 46, 47, 90, 93, 94, 96, 126, 128, 141, 148, 189, 212, (except as to $17 50, for cash paid in testator's life-time, Mrs. Matherson's passage to the bay, as to which alone the credit was legal,) 273, 402, 453, 78, (except so much of it as is charged to Wm. Matherson, which is a proper credit,) 89, 298, 598, and 605.

[3.] It is proper to remark, that some of the vouchers

Pearson and Wife v. Darrington.

stated by the special register to have been proved, are included in the foregoing list of credits not allowed. We do not intend that some of them are established, because we find them included by the special register in a list of moneys furnished to Mrs. Matherson by the administrator; and we think it is thus affirmatively shown by the record that the special register bases his conclusion upon the incorrect legal proposition, that the widow was entitled to a maintenance from the estate. Wherever the contrary of the special register's assertion appears from the record, either in the manner above indicated or any other, the credits are excluded. Some items of credit are also included in the foregoing list, which embrace indiscriminately articles for the widow and the children. The record discloses that no means were afforded by which the amount of the expenditure arising from the maintenance of the children could be distinguished. A credit, legal in part only, where there are no means afforded of distinguishing the legal from the illegal part, should have been rejected by the register. It would be unreasonable to require the party excepting to point out the illegal part of the credit, when there is no mode of discrimination. There being no distinguishable legal part of the credit, it was the register's duty to exclude the entire credit. The *onus* was upon the administrator to establish the credit. He cannot be said to have done so, when he merely proves that some indistinguishable and undefined part of a gross amount was legal. To require the party excepting to point out the illegal part of the account, would deny the right of exception, and shift the *onus* of proof from the administrator. The authorities which require an exception to point out the illegal part of an aggregate which is in part legal, do not apply to cases where a party brings forward a credit and asks its allowance, when there is commingled with it an undistinguishable proportion of illegality.—Moore v. Langford and Wife, 6 Simons, 323 ; Pearson v. Knapp, 1 Mylne & K. 312 ; Brantley v. Gunn, 29 Ala. 387 ; O'Reilly v. Brady, 28 Ala. 530 ; Royal v. McKenzie, 25 Ala. 363.

There is an item contained in voucher 212, for the pay-

ment of Mrs. Matherson's "passage to the bay," which is dated in June, 1836, in the life-time of Matherson, and which, not coming within the principle fatal to the rest of the voucher, was allowable, upon the ground hereafter discussed, that Matherson was responsible for necessaries furnished his wife when living separate from him; and the contrary of the register's assertion that it was proved does not appear.

[4.] There is an account of R. S. Buncker & Co., for payments upon which the defendant Darrington claimed credits. The credits thus claimed are designated as vouchers 50, 52, 68, 70, 79, 219. This general account consists of four minor accounts; one charged to William Matherson, for articles sold in his life-time ; one charged to Mrs. Maria Matherson, for articles sold in the life-time of her husband; one charged to Mrs. Maria M., for articles sold after the death of her husband; and one charged to the estate of Matherson, for articles sold after his death. The first of the above named accounts was paid, in part, by the decedent in his life-time; and the liability of the estate for the remainder is contested, upon the ground that it consists, in part or in *toto*, of articles sold to Mrs. Matherson, when living separate and apart from her husband in his life-time.

Mrs. Matherson separated from her husband in June, 1835, about a year before his death, and took up her residence in Mobile county. She continued to reside there, apart from her husband, until his death. The separation is conceded to have been an act of necessity on her part, produced by the improper conduct of her husband. She had under her care during that time her three daughters, one of whom was at school the greater portion of the time. A previous separation had taken place; and upon the occurrence of a reconciliation, Matherson made an agreement, denominated the "Murder-Creek settlement," that if Mrs. M. should again leave him on account of unkind treatment, he would pay her annually $600, and allow her a carriage and horses, and three servants. At the last separation, Mrs. M. was furnished by her hus-

band with five or six hundred dollars, a carriage and horses, and three servants.

The husband is not only liable for necessaries supplied to the wife, living apart from him under a necessity produced by his misconduct; but he is so liable even when the separation is by mutual agreement, and he has made an allowance for her, if that allowance is inadequate, and not suitable to the husband's fortune and rank.—2 Bright on H. & W. pp. 5–20, §§ 2 and 3. The provision made by the husband was not adequate and suitable to his fortune. She received from others some money which, we infer, was by way of loan; but that does not affect the question of the suitableness and sufficiency of the husband's allowance. Every separate claim for supplies to her must stand upon its own merits as a charge against the husband. Matherson was a man of very large fortune, whose family occupied an elevated position in society, and were accustomed to live in the style prevalent among wealthy Southern planters. It is certain that Mrs. M. could not have lived, upon the allowance made to her, in the manner to which she had been accustomed at her husband's home. That she had her daughters under her charge, should be taken into the account, under the circumstances of the case; especially as the husband does not appear to have made any provision for their maintenance. As the allowance made by the husband was inadequate, his estate was chargeable with, and the administrator is entitled to a credit for, payments made on account of necessaries furnished to Mrs. Matherson. Taking into the consideration rank and fortune, and the accustomed style of living, we classify the articles in the first of the above named accounts as necessaries; and we decide, therefore, that the administrator should have been credited with the amount paid in discharge of that account.

It is manifest that the account for articles furnished Mrs. Matherson during the life-time of her husband, and charged to her, was contracted on her credit, and not on the credit of her husband. The fact that the charge was to her, shows, *prima facie* at least, that the credit was given to her. As the credit was given to the wife, and not to

the husband, the latter was not chargeable, even though the account was for necessaries; and the administrator ought not to be credited with the amount paid on the account.—2 Bright on H. & W. 17, § 14. The account against Mrs. Matherson, contracted after the death of her husband, and commencing July 7th, 1836, is proved to have consisted of supplies to the family of the deceased, including Mrs. Matherson. The proportion of those supplies which was for the children of the deceased, cannot be distinguished; and the administrator, upon a principle herein before settled, must be denied the credit *in toto*. The fourth account, commencing 3d January, 1837, differs from the last, only in the fact that the estate is charged; and the administrator's credit for its payment must be rejected upon the same principle. The administrator is entitled to a credit on account of the payments to R. S. Buncker & Co., only for the amount paid in discharge of the account contracted in the life-time of the deceased and charged to him.

So much of the account of Roper & Moody as accrued after the death of Matherson, was not a charge against the estate, because the articles were furnished for the family, without discrimination. So much of it as accrued in the life-time of Matherson, and was charged to Mrs. Matherson, was not a proper charge against the estate, because the credit was given to Mrs. Matherson. So much of it as accrued before the last of February, 1836, was not proved. So much of the account as was contracted after February, 1836, is proved by the witness Lataday, and the administrator was entitled to a credit for that part of it which accrued after February, and before the 4th April, 1836, from which time the credit was given to Mrs. Matherson. The administrator is only entitled to a credit for the payment of that part of the account, which accrued between February and the 4th April, 1836, which seems to have been for necessaries, consisting of ladies' clothes supplied Mrs. M. and her daughters, when she was living apart from her husband. Vouchers 161 and 57 must be rejected, except for the amount above indicated.

There is an account of John D. Bracey, for $3,044, upon

which the following payments were made by the administrator: $800, $1110 73, and $1133 77. The credits tor those payments are designated as vouchers 7, 46, and 367. The correctness of the account upon which those payments were made was not established; and the administrator was, therefore, not entitled to a credit for either one of the three vouchers. That the account is not proved, is apparent from the record.

[5.] Affidavits are found in the testimony accompanying the report of the special register, which show the correctness of some of the accounts paid off by the administrator. The reception of those affidavits as evidence does not appear to have been objected to before the special register; and although it might have been the duty of the register to have rejected such testimony if objection had been made before him, the question of its competency could not afterwards be raised. The law is so laid down in 2 Daniell's Ch. Pl. & Pr. 1382. It was the duty of the chancellor to treat those *ex-parte* affidavits as competent evidence, when the exceptions were heard by him. If the register incorrectly reported the affidavits as matters of evidence, objection should have been made upon that ground. We cannot intend against the correctness of the report in that particular. Upon testimony of this character, vouchers 48 and 476 should have been allowed.

[6.] The debt of John Ferguson was established before the register, by testimony which would have authorized a recovery, in a court of law, against the administrator. The administrator was, therefore, entitled to a credit for the payments made by him upon the debt.—Gaunt v. Tucker, 18 Ala. 27. It is clear that the administrator could have successfully defended against any suit, predicated upon the allegation of the payment by Ferguson of the *Andrew Moffat* judgment. The papers of the deceased, of which the administrator either did know, or might have known by the exercise of reasonable diligence, afforded the means of making such defense. But it is not from that source, that we deduce the liability of the deceased which was discharged by the administrator. The testator procured Purvis & Co. to give Ferguson written

authority to draw drafts upon them, to the amount of $3,000, which they promised in the writing to honor. Purvis & Co. were induced to this act by the written promise of the testator to reimburse to them whatever they might pay. The letters of McKenzie, Mackay, and Wm. Primrose & Co., having been received in evidence without objection, must be regarded as competent testimony, so far as they state relevant facts and the testator's acknowledgments. The facts and acknowledgments shown in those letters, and the testimony of Melville Bracey, in connection with proof of the testator's arrangement with Purvis & Co., being brought before a court of law, would have secured a recovery, at least to the amount of three thousand dollars, which was paid by the administrator. The credits designated by vouchers 63, 87, 159, and 211, being for payments made upon this debt, should have been allowed.

The administrator was chargeable with the house frame sold to Ferguson, and the allowance of it as a credit by the special register was a palpable error. So the administrator was chargeable with lumber sold Ferguson. He must be debited with those items, and credited with the payments on the Ferguson debt as above decided.

[7.] The question of the administrator's right to a credit for payment made to J. Wiley & Co., was first before the chancellor on an exception of the complainants to the allowance of the credit by the special register. The chancellor correctly sustained the exception, because the only proof before the special register of the correctness of the account upon which the payment was made was the administrator's answer, which, we decide, was not evidence against the administrator's co-defendants, who were interested in this item adversely to him.—See the decisions of this court referred to in Reavis' Digest, page 244, § 109. When the credit was the second time before the chancellor, on an exception by complainants to the register's allowance of it, the proof showed that the account consisted of articles supplied to Mrs. Matherson. So much of the account as is of date subsequent to the testator's death, upon principles hereinbefore settled, was not a

proper charge against the estate. All the items in the account from the 10th April, 1835, to 18th May, 1836, inclusive, were contracted in the testator's life time, when his wife was living apart from him; and, with the exception of articles to the amount of $3 50, were for necessaries. To the extent of this last named part of the account, except $3 50, the administrator should have been allowed the credit designated as voucher 82.

[8.] The chancellor, upon exceptions by the complainants, rejected a number of credits claimed by the administrator, for commissions paid for the acceptance of drafts drawn, and for advancing money by commission-merchants, to pay the liabilities of the estate. We approve that decision of the chancellor. The law imposes no such duty upon an administrator, as the procurement of money by acceptances and advancements for a commission. If he has procured money by such means, it is his individual transaction. For payments beyond his receipts the law allows him legal interest, and can allow no more. There is nothing in the nature of the duties prescribed by the will, which could render such a mode of procuring money a legitimate official transaction. The procurement of money by such means belongs to a system of speculation upon prospective crops, which, however it may prevail among planters, cannot be recognized as within the authority of one who carries on a plantation in the capacity of administrator or executor, unless some peculiarity in the trust shall authorize it. Such is not the case here. The credits, of this class, which were properly rejected, are as follows: Vouchers 88, 158, 165, 195, 196, 209, 211, 218, 220, 253, 254, 265, 373, (so far as it is for commissions,) 403, 394, 466, 584, and 599.

[9.] The complainants object to the allowance of a credit for the payment of costs by the administrator upon the judgment of T. W. Smith & Co., which was founded upon a note of the testator. While we do not see what purpose the administrator had in permitting this suit to be brought, yet we do not find any evidence that it was the result of negligence or bad faith on his part. It is impossible to lay down any rule, by which an administra-

tor is to be governed in determining the propriety of contesting by suit a debt brought against the estate. Much must necessarily be left to the discretion of the administrator.—Savage v. Benham, 11 Ala. 49. Negligence, official misbehavior, or *mala fides*, must be shown, before he will be denied a reimbursement out of the assets for the costs paid by him. The presumption of *mala fides*, misconduct, or negligence, is not to be made against him. It does not appear that there was any want of good faith, diligence, or proper conduct, in the omission to pay without suit; and, therefore, he should have been credited with the amount of costs paid by him.—O'Neill v. Donnell, 9 Ala. 734; Savage v. Benham, 11 Ala. 49; Jones v. Dyer, 16 Ala. 221, 228; Moses v. Murgatroyd, 1 Johns. Ch. R. 473; 2 Lomax on Ex'rs, 501.

What would have been the legitimate inference, if the facts were simply, that the administrator had permitted himself to be sued upon a promissory note of the testator, and had interposed no defense to the suit, it is not necessary in this case to decide. The note was a large one, payable to a house in Liverpool; was executed in another State; and it does not appear that the administrator knew, or had any means of knowing, under what circumstances, and for what consideration, it was given. The record discloses that a plea in abatement was interposed by the administrator; and that afterwards, upon verdict, a judgment was rendered. What the allegations of the plea in abatement were, and what the issue tried by the jury was, we cannot ascertain from the record; nor are we informed whether any other defense than the plea in abatement was set up. There was an understanding between the payees and the maker of the note, that the proceeds of cotton, shipped by the latter to the former, should be appropriated to the payment of the debt; and the testator had received a letter, notifying him of the sale of some of the cotton, and indicating a high degree of probability that other cotton would be sold in a short time on such terms as to leave a balance in the hands of the plaintiffs, after paying the advance on the cotton made to Matherson. Indeed, it appears that the testator was

really entitled to a credit, for the omission to prove which on the trial we shall hereafter charge the administrator. Under all these circumstances, we cannot say that the administrator, in the omission to avoid the suit by the payment of the debt, has not exercised a reasonable and proper caution, or that he has been guilty of *mala fides* or negligence.   Our conclusion is, that the administrator is entitled to a credit for the costs mentioned in voucher 108.

In the life-time of the testator, and after the execution of the note above named, Matherson shipped cotton to the payees of the note, having obtained a large advance in Mobile upon the cotton so shipped.   The cotton was sold by T. W. Smith & Co., for an excess above the advance and all expenses; and they acknowledged, in a letter addressed to Matherson, the right of the latter to such excess.   It is clear beyond question, as we decide from the evidence in the record, that that letter would have conclusively established a credit on the note for the amount of such excess, if it had been brought forward by the administrator on the trial of the suit on the note. The suit on the note was commenced, and judgment rendered, against Darrington and Murphy, his co-administrator; the latter having lived for several years after the judgment.   It was proved before the register, that there was an endorsement upon the letter, in the handwriting of Murphy, which showed that he knew of its existence. Murphy, knowing of the existence of the letter, was guilty of inexcusable negligence, which rendered him liable; and as the administration bond of Murphy and Darrington was joint, Darrington was, upon the principle settled in Williams v. Harrison, 19 Ala. 277, liable for the negligence of Murphy.

[11.] Besides, it appears from the testimony of Forbes, that as late as '46 or '47, the letter was among the papers of the testator; and from that fact, together with Murphy's endorsement, it is deducible that the letter was among the papers of the deceased pending the trial in the court of law.   The exercise of proper caution and care required from Darrington an examination of the papers of

17

the testator before judgment was rendered against him for the full amount of the note. Such an examination would have brought to his knowledge the letter. We hold, therefore, that Darrington could, by the exercise of proper diligence, have known of the defense, and was guilty of negligence in omitting to set it up; and is liable, upon grounds independent of the negligence of his co-administrator. We cannot, upon the testimony, sustain the argument, that Darrington was prevented from obtaining a knowledge of the letter by its removal from among the papers of the deceased. We conclude that it was among those papers until '46 or '47, long after the judgment was rendered; and we think the evidence fails to show that the testator had received the balance due him in his life-time. The credit of the administrator, for the payments made upon the judgment, were subject to the deduction above indicated; and the chancellor did not err in overruling the defendant's second exception to the special register's report.

[9.] The administrator should have been allowed the credit designated as voucher 119, for costs paid on the judgment of Gordon, upon the principle, that the suit was defended, and it does not appear that the suit or the defense of it was the result of bad faith, negligence, or misbehavior in the administrator.

[12.] The credit for payment made to Wm. H. Harrison & Co. was not sustained. It appears from the testimony of the witness who is said by the special register to have proved this credit, that he did not know, and, therefore, could not prove, all the facts necessary to establish the correctness of the debt and its payment. The letter of J. D. Bracey, which was offered in evidence to support this and some other items, was not competent testimony. It amounted to nothing more than hearsay, and, being objected to, cannot be deemed evidence. The fact that Bracey was dead, or had left the country, could not make his mere declarations, either written or spoken, competent evidence. The rejection of this item as a credit by the chancellor was proper.

[13–14.] The testator was the administrator, in South

Carolina, of the estate of Bracey, the former husband of his wife. He was not administrator by appointment of any court in the State of Alabama. The orphans' court of Clarke county, in which the administration of defendant Darrington was pending, made an order that he should pay to the "*legatees of Jolly Bracey*" $2455 55, on account of the hire of the slave Levin. The administrator paid that amount to the children of the deceased Bracey, and claimed a credit for the payment; and it is argued in favor of the allowance of the credit, that the administrator stands justified in the payment by the decree of the orphans' court; and that, aside from the decree, the demand was a lawful one, which the administrator was bound to pay. The decree of the orphans' court was void, because it had no jurisdiction over the subject-matter. The orphans' court has no authority to render a judgment or decree for demands against an estate, unless it has been declared insolvent. The decree of the orphans' court, being void, afforded no protection to the administrator.

A chancery suit was instituted, in 1826, by the children of Bracey, to whom the above named payment was made, to recover their shares of the estate of their deceased father from Matherson, as the administrator of his estate. This suit terminated, in 1828, in a settlement. By that settlement, in consideration of certain property and money paid to them, the complainants separately released and acquitted Matherson by formal instruments of writing, from all claim against him as administrator. The settlement and release, as to two of the complainants who were infants, was ratified by a decree of the chancery court, and was formally ratified in writing by them after attaining majority. These releases and confirmations of the releases were all set out in an exhibit to a bill in chancery filed against the testator by his wife and children. The suit instituted by that bill was pending at the death of the testator; the administrator, Darrington, was made a party defendant; and, after he became a party, the suit was continued, from term to term, for about ten years, when it was dismissed. The decree of the orphans' court, upon which the payment was made, was rendered after

the dismissal of the suit. The administrator must be regarded as having had notice of the releases, which were exhibited with the bill in chancery in the suit to which he was so long a defendant. The releases constituted a perfect and indisputable defense against the demands paid off by him. Having such a defense, and being notified, in the estimation of the law, of its existence, he has paid the claims in his own wrong, and is entitled to no credit for such payments. It was not necessary that the complainants should, by allegations in their bill, controvert this item of credit. It was a defensive matter brought forward by the defendant, which it was incumbent on him to sustain by proof. Defendant was neither entitled to a credit for the payment to John D. and Melville Bracey, nor for the payment to McRae in right of his wife, who was the other one of the Bracey children. The chancellor did not err in the rejection of credits designated as vouchers 193 and 194.

[15.] The credit designated by voucher 197 is for payment of the account of Blount & Sherman, on account of professional services as lawyers. The chancellor's allowance of a credit for the fees in the cases of T. W. Smith & Co., and John G. McKenzie, and his rejection of a credit for attorneys' commissions in the case against Lenox Blackie, we approve, because those rulings were required by the state of the testimony. The account contains a charge of $1000 for a fee of Blount & Sherman in the chancery suit of Mrs. Matherson and her children against her husband, for a divorce of Mrs. M., and the enforcement of a marriage settlement; a charge of $150 for a fee of the counsel of Mrs. Matherson in a petition for alimony *pendente lite*, and the custody of the children; and a charge of $50 for "services as agent in Mobile, receiving claims against the estate, giving receipts therefor, settlement of John Ferguson's claim, advice, &c."

In determining whether the administrator properly paid the charges of $1000 and $150, for the fees of Mrs. Matherson's counsel in her suit for divorce and the enforcement of a marriage settlement, and her application for

alimony *pendente lite* and the custody of the children, two questions are to be examined: first, whether or not the chancery court, in which the suit was pending at the death of Matherson, could have rendered a decree for those fees against the administrator; and, secondly, whether or not those fees could have been recovered from the administrator in an independent suit.

The husband is not responsible for his wife's expenses, in a suit against him for the enforcement of a marriage settlement. The power of the court to allow to the wife, in a divorce suit, alimony *pendente lite*, and to compel payment by the husband of her expenses in the suit, is predicated upon grounds which have no application to a suit in reference to a marriage settlement. If, then, the chancery court had any authority to render a decree for the counsel fees of Mrs. Matherson, it was by virtue of its jurisdiction over the subject of divorce.

The suit progressed without an order for the payment of Mrs. Matherson's counsel fees until Matherson died. By his death the suit, so far as it was an application for divorce, necessarily terminated. The marriage being dissolved by death, there was no interest in the *divorce* feature, which survived for or against any person; and, therefore, the suit as to that feature abated absolutely, and was not susceptible of revivor.—Story's Eq. Pl. §§ 329, 330, 356; Miller v. Woodman, 14 Ohio, 518. After the termination of the power of the court over the subject of the divorce, the court could not take cognizance of Mrs. Matherson's claim to an allowance of counsel fees in the divorce suit. Although the suit was revived against the administrator, and although the revivor may have been proper enough in reference to the branch of the case relating to the marriage settlement; yet the jurisdiction over the subject of divorce was at an end, and, with it, the authority of the court to decree in Mrs. Matherson's favor her counsel fees. It results, that the administrator is not justified in the payment of those counsel fees upon the ground that he might have been compelled to pay them by an order in the chancery suit, which was still pending.

There are other satisfactory reasons why the court cannot, after the husband's death, proceed in the wife's divorce suit, to render a decree against the defendant's representative for the counsel fees. The allowance of the wife's expenses in a divorce suit is analogous to the allowance of alimony *pendente lite*, and temporary alimony, as contradistinguished from that permanent alimony, which is the result of a divorce *a vinculo matrimonii*. It has been decided, that the wife may recover, after the termination of the marriage, arrearages of alimony due by virtue of a decree rendered pending the marriage.—Harrison v. Harrison, 20 Ala. 629; Smith v. Smith, 1 Root, 349. But the authorities clearly establish the proposition, that a recovery for a maintenance during the marriage cannot be had after the husband's death.—Anonymous, 2 Des. 198; Gaines v. Gaines, 9 B. Monroe, 295; Bishop on M. & D. § 559; 8 Simons, 321; 7 Simons, 22. The principle is as applicable to the recovery of counsel fees, as temporary alimony. Besides, the allowance of counsel fees in a divorce suit is but an incident to the jurisdiction over the subject of the divorce, and is subject to the discretion of the court; to be exercised, however, according to established principles.—Bishop on M. & D. §§ 574, 581; Richardson v. Richardson, 4 Porter, 467, 479; Willard's Eq. Jur. 664; McGee v. McGee, 10 Georgia, 477; 2 Kent's Com. 99, note *a*; North v. North, 1 Barb. Ch. R. 241; Melizet v. Melizet, 1 Parsons' Select Equity Cases, (Penn.) 78. That the chancery court, which has had jurisdiction of a divorce suit, cannot, after the respondent husband has died, decree to the wife her counsel fees, is a corollary from the propositions, that the jurisdiction over the matter of divorce has ceased, and that the allowance of such fees is an incident to that jurisdiction, and a matter within the chancellor's discretion to be exercised in the divorce suit. As the chancery court could not have ordered the payment of the charges under consideration, it follows that the administrator has wrongfully paid them, unless they could have been recovered from him in an independent suit.

[16.] The services of the counsel for Mrs. Matherson

were not rendered under a contract with Matherson; and his administrator could only be subjected to their payment, by action, upon the idea of an implied contract. The law implies a contract by the husband to pay for necessaries furnished to the wife, when he has driven her from home by cruelty; but the counsel fees in a divorce suit are not necessaries. Lord Ellenborough, in the case of Shepherd v. Mackoul, 3 Camp. 326, classed a lawyer's fee for assisting the wife to exhibit articles of peace as necessaries. The decision is placed upon the ground, that the exhibition of articles of peace was the necessary means of preservation and safety to the wife. To no greater extent has the charging of the husband with the fees of the wife's counsel as necessaries been carried. Suits for divorce, or in reference to a marriage settlement, are not the necessary means of preservation and safety; and professional charges in such cases do not come within the principle of Shepherd v. Mackoul, *supra*, and cannot be deemed necessaries.—Shelton v. Pendleton, 18 Conn. 417; Wing v. Hurlburt, 15 Vt. 607.

[17.] We are constrained to decide, that the administrator was not entitled to a credit for the payment of the charge for "services as agent in Mobile, receiving claims against the estate, giving receipts therefor, settlement of John Ferguson's claim, advice, &c." The law does not require the administrator to appoint an agent at any particular place, for the reception of claims against the estate. It is for the creditors to go to the administrator for the presentation of their demands, and not for the administrator to appoint an agent for their convenience. There does not appear to have been any necessity for such agency. The administrator cannot be allowed a credit for money expended in the compensation of an agent, whose appointment was neither necessary nor required by law. What part of the charge was for the services of such agent, and what part for the other services mentioned, cannot be determined, and the entire credit must be rejected.

We approve of the decisions of the court below, in reference to the different items which compose the account

for the payment of which a credit designated as voucher 197 was claimed.

[18.] The chancellor's decree in sustaining the exception of complainants to the allowance by the special register of the credit marked voucher 215, and in overruling the exception of the defendant to its rejection, is correct. The credit is not sustained, as the counsel suppose, by the special register's assertion that it was admitted. There is no proof whatever to sustain the correctness of the account, except an affidavit that it was made out by a book-keeper, since deceased. It does not appear that the entries on the book were made at or near the time of the transactions chronicled, or that they were made on the book giving an account of the daily transactions of the clerk, or that they were charged on the book by the clerk since deceased. There is no case, or principle, which recognizes such proof as sufficient to establish an account. 3 Phillipps on Evidence, 695; Clemens v. Patton, Donegan & Co., 9 Porter, 289; Nolley v. Holmes, 3 Ala. 642; Everley v. Bradford, 4 Ala. 371; Batre v. Simpson, 4 Ala. 305.

[19.] The credit designated as voucher 225 was for the payment of the account of J. C. Hodges, for repairing a carriage. The carriage was the same one furnished Mrs. Matherson by her husband when living apart from him. We concur with the chancellor, that this carriage, after Matherson's death, was a part of the estate. The testator directs the whole of the personal estate to be divided among his children, and, in the description of it, mentions pleasure-carriages. He also requires the estate to be kept together until the 21st March, 1852; and it is made the duty of the representatives of the estate, to educate, clothe, and maintain the children. Under this will, it was proper for the administrator to retain the carriage unsold. It is most reasonable to conclude, that the testator, in authorizing the retention of the carriage, intended that it should be used by his children. Three of the children were daughters. Taking that fact and the magnitude of the estate into consideration, we cannot say, that the keeping up of the family carriage was not legitimate, as

a part of a proper maintenance; especially as the will authorized the retention of the carriage. We think, therefore, that the payment for the repairs of the carriage, so as to make it subserve its appropriate purpose, was a legitimate charge against the estate. Certainly, the widow had no right to use the carriage; but we have no data before us, upon which a charge against the administrator could be made for the detriment done by the widow in the use of the carriage along with her children. We decide, that the administrator was entitled to a credit for the payment of J. C. Hodges, designated as voucher 225.

The credit for payment of J. P. Portis, for professional services, designated by voucher 236, was rejected by the chancellor. The testimony was insufficient to establish the correctness of the account upon which the payment was made; and, therefore, the rulings of the court below in sustaining the exceptions by complainants to the allowance of the credit by the special register and the register are approved.

[20–21.] A suit in the circuit court of the United States was brought against the administrator by Angus Stewart, upon two notes; and judgment was recovered. The case was taken by writ of error to the supreme court of the United States, and the judgment was affirmed. The administrator then filed a bill in equity for the injunction of the judgment, which resulted in a compromise, by which a large reduction was made upon the original recovery. The claim of the administrator to credits for the attorney's fees in the suit at law, and for the costs of the different proceedings, was contested in the court below.

The administrator was denied a credit for the payment of one of his counsel, upon the ground, that he was entitled to no compensation, in consequence of his neglect to take a bill of exceptions, for the purpose of revising the decision of the court upon the question, whether the proof in the cause was sufficient to revive a cause of action barred by the statute of limitations. The suit was upon two notes of the testator. The only testimony adduced on the trial, to show a revival of the cause of action, was that of one Levy. That testimony was to the following

effect: In 1836, Levy met the testator in Mobile, and reminded him of the promise, made many years before, to pay the notes when he became able. The testator said, he did not deny it, and that it was likely he had made such observation; and he expressed a grateful recollection of the kindness done him through one of the payees of the notes. The testator asked where the notes were, and, being told that they were in South Carolina, said, that he could do nothing, unless they were present. Levy then told him, that from what he had said, he was bound, not only in justice, but by every sentiment of honor, to pay the demand. Matherson replied, that *whenever the notes were presented, he would make a satisfactory arrangement; that the payment of the principal ought to be satisfactory, and that he wished Levy to so advise the creditor.*

Upon the principles of the leading case of Bell v. Morrison, 1 Peters, 351, which have been sanctioned by repeated decisions of this court, we think the testimony was insufficient to revive the debts.—Evans v. Carey, 29 Ala. 99; Pool v. Relfe, 23 Ala. 701; Towns v. Ferguson, 20 Ala. 147; Ross v. Ross, 20 Ala. 104; Deshler v. Cabiness, 10 Ala. 959; Lowther v. Chappell, 8 Ala. 353; Newhouse v. Redwood, 7 Ala. 598; Crawford v. Childress, 1 Ala. 489; St. John v. Garrow, 4 Porter, 223.

The statute of limitations was pleaded. At one time the court decided the question in favor of the defendant, and the plaintiff took a non-suit, which was set aside. Upon the final trial, the question of the sufficiency of the testimony to revive the debt was argued by the counsel for the defendant. There seems to have been no want of ability, learning, or care, in the argument by defendant's counsel. The argument, however, did not prevail; and the court charged the jury, that the testimony was sufficient to take the case out of the statute of limitations. The counsel, notwithstanding the decision of the court, adhered to his opinion, but omitted to take a bill of exceptions. Why he did not is not disclosed. It is manifest it was not because he was ignorant of the law; for he had twice asserted, and maintained by argument, the true doctrine of the law as we understand it. It may have been the

result of negligence; or because deferring somewhat to the opinion of the presiding judge; and made by his failure in the court below distrustful of the maintenance of his views in the appellate court, his judgment dictated the expediency of a forbearance to except. We are not to presume negligence, when the facts of the case may as well consist with some other hypothesis.—Mardis v. Shackelford, 4. Ala. 493. We cannot say that there was negligence. There was manifestly no ignorance of law. It is a case in which 'one, attentive to his duties, and understanding the law, has committed an error of judgment, in determining whether he should yield to or revise a decision of the court. The degree of confidence which one has in his own opinion, and the amount of respect which he has for that of the presiding judge, are all elements influencing the decision of such a question. The ruling of the court involved not merely a knowledge of the law, but the ascertainment of the meaning of the testimony. The judge doubtless understood the law correctly, and only erred in the conclusion, that the testimony established with requisite clearness a willingness and liability to pay the debts. While we think the testimony was not sufficient, it is undeniable, that the question is not so clear that it might not differently strike the minds of able lawyers. When a lawyer yields to the opinion of the presiding judge, in reference to such a question, and forbears to take an exception, he cannot be convicted of a want of professional skill, professional knowledge, or professional diligence.

For such errors of judgment as we think the attorney in this case committed, neither authority, principle, nor policy requires that the profession should be held liable. In Purvis v. Landell, 12 Clark & Finelly, 91, before the House of Lords, Lord Campbell said: "It would be monstrous to say he [an attorney] is responsible for falling into what must be considered a mistake. You can only expect from him that he will be honest and diligent; and if there is no fault to be found, either with his integrity or diligence, that is all for which he is answerable. It would be utterly impossible that you could ever have a

class of men, who would give a guaranty binding them-
selves, in giving legal advice and conducting suits at law,
to be always right." While we are not prepared to en-
dorse all that is said in this quotation, which relates to
attorneys, and not to professional men charged with
the trial of causes, we approve it fully, to the extent
that a lawyer cannot be responsible for an error which
is the result of neither ignorance, negligence, nor fraud.
The lawyer must be guilty of some misconduct, or
some fraudulent proceeding, or •should be chargeable
with gross negligence, or with gross ignorance, to ren-
der him liable; and it is so said by Lord Campbell in the
above named case.—Story on Agency, 27; Parker v.
Rolls, 28 English Law and Equity Rep. 424; Evans v.
Watrous, 2 Porter, 205; Cox v. Sullivan, 7 Georgia, 144;
Hart & Hodge v. Frame, 6 Clark & Finelly, 193; Kemp
v. Burt, 4 Barn. & Adol. 424, (24 E. C. L. 93.)

The attorney could have recovered his fee from the
administrator; and, therefore, the administrator should
have been allowed a credit for its payment. This credit
is designated as voucher 239.

[22.] The administrator was entitled to a credit, also,
for the payment of the fee of Mr. Blount in the same case.
The special register says, the voucher was proved by
Blount, and by the testimony attached to the account,
which consists of statements that the services were worth
the amount charged. The chancellor rejected the credit,
because it appears that Mr. Blount was not present at the
final trial of the cause. What the contract between Mr.
B. and his client was, does not appear. We do not say
that the fee could have been recovered, if the engagement
of Mr. B. had been a general one, to represent the inter-
ests of the defendant in the suit. Such, however, is not
shown to have been the contract; and upon a principle
heretofore laid down in this opinion, we must intend,
when the register says the item was proved, and the con-
trary does not appear, that it was sustained by sufficient
testimony. The contract does not appear to have been
such that the value of the services actually rendered could
not have been recovered upon a *quantum meruit;* and,

therefore, the entire credit designated as voucher 340 must be allowed.

[23.] The litigation in the supreme court of the United States, and in equity after the judgment at law, was had in good faith by the administrator, under and in pursuance to the advice of learned counsel, and under circumstances of probable success, as it appeared to the administrator with the lights before him, and attainable by reasonable diligence. After the making of vigorous and industrious efforts to procure the testimony necessary to sustain the bill in equity, without success, and when there was no farther prospect of obtaining such testimony, the administrator, under the advice of counsel, effected a compromise, by which a large reduction was obtained. This compromise was beneficial to the estate ; and, in making it, the administrator did not transcend his powers.—Woolfork v. Sullivan, 23 Ala. 548. The authorities justify the decision, that the administrator was entitled to a credit for the costs and reasonable expenses of litigation had under the circumstances above stated.—Fagan v. Fagan, 15 Ala. ; Vez v. Emery, 5 Vesey, 141 ; Doyle v. Blake, 2 Sch. & Lef. 243 ; 2 Lomax on Ex'rs, 501 ; Jones v. Deyer and Wife, 16 Ala. 228.

Several of the contested items of cost are sustained only by the special register's assertion that they are proved, and have been hereinbefore allowed, upon the principle that the register's statements must be deemed true when the contrary does not appear. Vouchers 375 and 587, being for a part of the costs, were proper credits.

Voucher 464, which is claimed to have been for costs in this case, is not sustained. The evidence shows the payment, but does not show that such costs accrued. The special register says it was proved by the marshal's receipt. The complainants' exception to this credit should have been sustained.

[24.] So much of voucher 532 as is for commissions of the marshal for collecting an execution on the Stewart judgment was rejected, upon the ground that the account showed that the administrator had funds in his hands with which to have made the payment without the issue

of an execution. The remainder of the voucher was properly allowed as a credit. If it should appear, upon the restatement of the account in accordance with the decisions of this opinion, that the administrator had funds of the estate in his hands adequate to the payment of the judgment when the execution issued, he should not be allowed a credit for the marshal's commissions. When no reason for the postponement of payment exists, and the administrator has the means of payment, he should not permit the estate to be taxed with the expenses of a collection by the marshal or sheriff.

[25.] The credit designated as voucher 447 was for the payment of costs in the case of Hall, Weeks & Co. against the administrator. This voucher was properly rejected, upon the ground that there was no proof of the correctness of the bill of costs paid by the administrator. The credits designated by vouchers 270, 352, 583, 271, 313, 415, 519, 522, 576, 577, 574, 596, 606, and 407, were all properly rejected, because they were not sustained by evidence. There must, in every case, be proof of the payment, and proof of the correctness of the demand paid. Gaunt and Wife v. Tucker, 18 Ala. 417; Savage v. Benham, 11 Ala. 49.

Upon the principle heretofore laid down, as to the allowance to an administrator of a credit for the payment of costs of unsuccessful litigation, voucher 293 was properly allowed as a credit in the court below. Voucher 446 was also properly allowed as a credit, upon the principle that there was no evidence of negligence, misbehavior, or improper conduct in the litigation.

[26.] The complainants assign for error the overruling by the chancellor of their exception to the allowance of a credit for the payment of D. B. Ogden's fee as counsel for the administrator in the case of Stewart in the supreme court of the United States. There is no proof, and no statement from which we can infer that there was proof, of the value of the services rendered. We cannot look to the argument, as we find it printed in the report of the case in 2d Howard, and take judicial cognizance that the making such an argument in such a case was

Pearson and Wife v. Darrington.

worth the amount charged. The chancellor erred in the allowance of this credit, which is designated as voucher 314.

If it be conceded, that the justness of the account was established, for the payment of which a credit designated as voucher 343 was claimed, the credit was nevertheless properly rejected, because there was no proof of the payment.

[27.] In the chancellor's decree, ordering a reference to the register, after passing upon the report of the special register, he directs, that witnesses whose depositions had been taken, or who had been orally examined on the former reference, should not be examined, unless the witness should make affidavit to the facts omitted in his former testimony, and the party desiring the testimony should make affidavit that he had no knowledge of the same until after the former examination.

It is clear from the authorities, that a party has no right, upon a reference, to re-examine a witness whose testimony was taken before the hearing, or whose examination has been taken in writing upon a previous reference, without an order.—2 Daniell's Ch. Pl. & Pr. 1383, 1384, 1385, 1386; 3 Greenl. Ev. § 336; Remsen v. Remsen, 2 Johns. Ch. R. 495; Jenkins v. Etheridge, 3 Story, 299; Courtenay v. Hoskins, 2 Russell, 253; Metford v. Peters, 8 Simons, 630; Cowslade v. Carnish, 2 Vesey, sr. 270; Rowley v. Adams, 1 Mylne & Keene, 543; Vaughan v. Lloyd, 1 Cox, 312; Smith v. Althus, 11 Vesey, 564; Whittaker v. Wright, 2 Hare, 321. After a careful examination, we find no authority conflicting with the law as above laid down, except Swinford v. Horne, 5 Madd. 379, which seems, from the imperfect report of the case, to maintain the proposition, that a witness examined before the decree may be re-examined before the master as to different matters, without an order. But the authority is denied in Tamlyn on Evidence, 82. Exceptions are admitted to the general rule, where the reason of the rule is inapplicable. Thus, a witness may be examined, without an order, as to all matters not in issue when the previous examination was taken, and as to all collateral questions

which may arise; and a witness who has been previously examined to prove exhibits, may be examined as to other questions; and there are, doubtless, other exceptions to the general rule, growing out of special circumstances. No circumstances exist, which would authorize us to make this case an exception to the general rule.

The register permitted the examination of the witnesses who had been previously examined, and then excluded the testimony from his consideration, but reported it to the chancellor. We perceive no item, the decision upon which would have been changed by the admission of the testimony rejected, except the payment to D. W. Murphy for professional services, designated as voucher 460. The witness whose testimony was rejected, had been previously examined more than once, as to other points; and it is highly improbable that the party offering him was not aware of what he would prove. Much is left to the discretion of the chancellor, in determining under what circumstances a re-examination may be allowed.—Beach v. Fulton Bank, 3 Wendell, 573; Phillips v. Thompson, 1 Johns. Ch. R. 140. Allowing a proper margin to the chancellor's discretion, and proper effect to the peculiar circumstances under which the witness stood, we cannot say that the rule laid down was too rigid in its application to the particular evidence. Without determining whether it is a correct practice for the chancellor, *ex mero motu*, to prescribe in advance such a rule as was laid down in this case, we cannot decide that the application of the rule was improper, in the only particular in which it operated to the prejudice of the defendant.

[28.] The account of Ledyard, Hatter & Co. against the testator, numbered voucher 440, was established, in part, by an affidavit which accompanies it, and is reported in the evidence without objection by the complainants. The objection was to the entire account, a part of which, at least, was proved; and, therefore, we cannot say that the chancellor erred in overruling the exception.

[29.] The administrator was clearly chargeable with the $1500 which he permitted to go into the hands of

Wm. A. Matherson. The register allowed him credits for so much of that sum, as was appropriated to purposes constituting a legitimate charge upon the estate. The estate, as heretofore decided, was not chargeable with the payment of Mrs. Matherson's debts, or with the duty of furnishing money to her; and, therefore, the court below did not err in the rejection of the credit for so much of the above stated sum, as was appropriated to the payment of Mrs. M.'s bank debt, and as was furnished to her. The complainants objected to the charging of the administrator with the sum of $1500, upon the ground that the sale of the land, of which it was in part the proceeds, was void. The invalidity of the sale is argued from the fact, that the land was devised by the testator's will. We think the statute gives jurisdiction over the lands of decedents where they have been devised, (Clay's Dig. 224;) and the sale, which the court had jurisdiction to order, would not be void. The chancellor, therefore, committed no error in treating the proceeds of the sale of the land as assets of the estate. We approve all the rulings of the chancellor in reference to this sum of $1500, which have relation to vouchers 454, 398½, 400½, 409½, 410½, 438½, 445½, 455½.

We are unable to find in the transcript the judgments in favor of W. Cook and J. A. Davis, for the payment of which the administrator was allowed credits, designated as vouchers 474 and 475. The special register says, that the credits were proved by judgments; and we will presume, in the absence of every thing to the contrary, that the judgments were such as to afford *prima-facie* evidence of correct charges against the estate. The allowance of the commissions must, as decided in reference to another item, depend upon the state of the account when the executions issued. The credits are to be allowed, except as to commissions for collection; which are also to be allowed, unless it appears that the administrator had funds of the estate, which he might have appropriated to the discharge of the judgments, before executions issued.

[30.] The account of Gates & Smith, designated by vouchers 557 and 558, was proved before the register. A
18

part of the account was for articles furnished Mrs. Math-
erson, and was not a proper charge against the estate.
But the exception by defendant was a general one, to the
exclusion of the entire account, and not of the legal part;
and the chancellor therefore did not err in overruling the
exception *in toto*. .

[31.] The administrator should have been allowed a
credit for the payment of voucher 578. The parol evi-
dence of the judgment and witness tickets, was illegal;
but the complainants waived that question, by omitting
to object to the evidence. Looking at such evidence, we
find enough in the record to sustain the credit.

We think the proof establishes the correctness of the
claims of Cooper & Portis, together designated as voucher
600; and the credits should have been allowed.

[32–3.] The administrator claimed credit for the hire of
slaves belonging to the estate, which he purchased at a
sale made by the order of the orphans' court, after the
commencement of this suit, and before the filing of the
amended and supplemental bill. The slaves have remain-
ed upon the plantation; and it is contended for the
administrator, that the sale was valid and maintainable,
and that therefore he was entitled to the hire of those
slaves after the sale. We do not stop to inquire, whether
the sale in this case can be sustained, when tested as to
its fairness; because, in applying the principles laid down
by this court in a previous opinion in this case, we are
led to the conclusion, that the sale must be avoided upon
a different ground. .

The complainants, after the sale, by supplemental bill
obtained an injunction of the removal or sale of the
slaves by the administrator; and this court, in 21 Ala.
169, revised and reversed the decree of the chancellor
dissolving the injunction. The question of the validity
of the sale was then expressly left undecided; but the
court held, that the withdrawal of the administration from
the orphans' court was effected by the filing of the orig-
inal bill in this case; and that proposition must be deem-
ed indisputable law in this case. We should be inclined
to decide, as a sequence from that proposition, that the

orphans' court had no jurisdiction to order the sale; but, as the court then left the question undecided, and its decision is not now necessary, we leave it open. In that decision, it is declared to be the duty of the chancellor to avoid the sale, if it in any manner should conflict with the proper exercise of remedial justice, or should in any manner embarrass the administration of the estate in equity. When the jurisdiction of the chancery court attached, it became its province and its duty to distribute the property as required by the law and the will, if a sale should not be necessary to meet the demands against the estate; and to decide upon the necessity of a sale, and what property should be sold. By an order of the orphans' court, for the sale of about fifty slaves, it would seem inevitable that the chancery court would be materially disturbed and embarrassed in the exercise of its power in those particulars. By the making of the sale by order of the orphans' court, the chancellor was reduced to the necessity of permitting the slaves to go into the possession of the administrator, or of retaining them upon the estate by an exercise of his high powers. The latter course this court decided was the proper one, until the settlement of the estate. Unless this sale be set aside, the chancellor, in keeping the slaves upon the estate, awaiting the developments of the administration in his court, has necessarily constituted the estate an annual hirer of the slaves. It would be difficult to conceive of any thing which would more embarrass the administration of an estate in equity, than to force upon it the hire of such a number of slaves. For these reasons, we decide, that the chancellor did not err in avoiding the sale, under which the administrator claims the slaves. As the result of this decision, the chancellor's decree, so far as it rejects the claim of the administrator to hire of those slaves, must be affirmed.

[34.] With the value of those of the slaves which were carried off to New Orleans, and interest upon it, the administrator was certainly chargeable. The complainants assign for error the omission of the chancellor to decree interest to them; but we find that interest was

subsequently charged by the direction of the chancellor, as will be seen by reference to the register's report of 27th November, 1854. The defendant urges as an error, that too high a value was placed upon the slaves. The witnesses whose testimony is supposed to show that the price placed upon the slaves by the register was too high, are Duncan, Flinn, Seawell, Daffin, Nichols, and Roane. They prove the value in 1848, when the sale was made. The witness who speaks of the value in 1852, when the slaves were carried off, adopts a much higher estimate. According to the testimony of this last witness, the estimate was too low. The complainants had a right to take the value of the slaves at the time they were carried off; and looking at the testimony of the only witness who speaks of the value about that time, and whom we find no reason for disbelieving, the estimate of the register was too low, and, therefore, not prejudicial to the defendant. The complainants also excepted to the register's report, but they do not assign error for the overruling of their exception. The decree, as to the valuation of the slaves, contains no error against the party who complains of it in this court; and it is, therefore, in that particular, affirmed.

[35.] The chancellor placed the question of a charge against the administrator for steamboat wood, cut off the lands of the estate by Mrs. Matherson, and sold by her, on the true ground. As the estate was not chargeable with the maintenance of Mrs. Matherson, and she was entitled to nothing from it except her dower and distributive share, the administrator violated his legal duty in permitting her to take wood from the lands of the estate, and employ the slaves and stock of the estate in cutting and transporting it to the place of sale on the bank of the river. The fact that Mrs. Matherson appropriated an indefinite portion of the proceeds of the sale to the benefit of the children, cannot affect the legal question. The appropriation of the wood, and the labor of the slaves and teams of the estate by Mrs. Matherson, was a diversion of the property of the estate to an illegal purpose; and the administrator, who permitted it without the interposition

of an objection, must be chargeable therefor.   The estate was injured, to an extent equal to the value of the wood, and of the services of the slaves, stock, &c., employed in getting it to the place of market.   The amount with which the administrator is charged is certainly not greater than the proof authorized; and as the complainants do not assign any error in this court, the decree of the chancellor must be affirmed.   There is no error prejudicial to the administrator, who alone assigns error as to this point.

The charge against the administrator of $200, on account of the hire of the slave Jim Hampshire, was fully sustained by the proof; and the administrator, who alone presents any assignment of error covering that question, has no ground of complaint.

[36.] We are called upon to decide in this case, what rule shall govern the register in making the debits and credits of interest.   The administrator made the affidavit, prescribed by the statute, denying that he had applied the funds to his private use.   The administrator says, in his answer, that the receipts have never been sufficient to meet the demands against the estate, and that he has been compelled to make large advancements for that purpose. It is manifest, too, from the manner in which disbursements on account of the estate have been made, by drafts upon persons with whom there was no deposit, and by procuring loans, that in making them no regard was had to the question whether there was an unemployed balance of funds in the administrator's hands; and that the funds of the estate have not been kept separate and distinct from the administrator's individual funds.   Indeed, the answer negatives the idea, that the administrator has kept the funds of the estate unemployed in his hands.   It follows that, if the receipts have exceeded the disbursements, leaving a balance in the administrator's hands, he has either appropriated it to his own private use, or to some illegal purpose.   In the former alternative, his affidavit would be controverted, and he would be chargeable with interest.   In the latter alternative, he would be chargeable with interest on the sum unlawfully appropriated.

Gerald and Wife v. Bunkley, 17 Ala. 170; 2 Lomax on Executors, 338–339. Again: If the balance should be against the administrator, he must be charged with interest, because then it will be apparent, when that fact is considered in connection with the statements of the answer, that any retention of the funds in an inactive state would have been wrongful. With debts pressing against the estate, and drawing interest, it would be the duty of the administrator to appropriate any surplus in his hands to their payment; and his omission to do so would subject him to a charge of interest, as it does not appear that any circumstances existed which would justify him in keeping a balance on hand.—2 Lomax on Executors, 338; Powell v. Powell, 10 Ala. 914. It is apparent, however, that he has kept no funds of the estate unemployed. He has used them, either for the benefit of the estate, or for his own purposes. In any point of view in which the question is considered, the administrator is chargeable with interest upon the receipts. He must also be credited with interest upon all disbursements.

[37.] After looking through this entire case, we are not convinced that the administrator has been guilty of *willful* default, or *gross* negligence, *of which loss to the estate has been the consequence;* and, therefore, upon the authority of the cases of Powell v. Powell, 10 Ala. 900, and Gould v. Hays, 19 Ala. 438, we decide, that the administrator must receive the usual compensation of 5 per cent. on receipts, and $2\frac{1}{2}$ per cent. on disbursements. This is the rate of compensation suggested in the case of Magee v. Cowperthwaite, 10 Ala. 966, and it was adopted by the special register to whom the first reference was made. Taking into consideration the character and amount of trouble, risk and responsibility which must have been imposed upon the administrator, we do not regard the compensation above indicated as too large. That the administrator has been guilty of many errors, and has been negligent in taking vouchers and keeping his accounts, is disclosed most clearly by the record; but the errors may be attributed to misconstruction of the will, and misapprehension of the law; and he himself, as proved by a scrutiny of the

Pearson and Wife v. Darrington.

account presented, the credits allowed and rejected, and the charges made, has been the sufferer from his negligence, as well as from his misconstruction of the will and mistakes of law. The services of the administrator were rendered before the adoption of the Code; and in determining the compensation, we look to the law as it previously existed.

The above indicated rate of compensation must, however, cease at the time when the act providing an annual compensation was adopted, which was the 2d January, 1841. From that time up to the time when the estate passed into the hands of the receiver, an annual allowance was properly regarded in the court below as the mode of compensation.

[38.] The chancellor filed in the register's office, in January, 1852, a decree dissolving the injunction against the removal of the slaves bought by the administrator. The injunction was reinstated upon the taking of an appeal by complainants. Afterwards, and in February, 1852, the administrator carried to New Orleans five of the slaves; thus disobeying the injunction, and violating his legal duty as administrator. The excuse for this act is ignorance of the reinstatement of the injunction. The chancellor soon afterwards, in February, 1852, ordered that the administrator should bring back those slaves from New Orleans, and deliver them to the receiver, who was appointed at that term. This order the administrator did not obey. The act of the administrator, in carrying off and not returning those slaves, may not have been a willful violation of his official duty as administrator; but it was persisted in, in disobedience of the chancellor's order. The circumstances relied upon to excuse this conduct may mitigate the offense, *in foro conscientiæ*; but the law cannot find in them a justification for the disobedience to its mandate. We find no error in the direction of the chancellor, that the compensation should cease from the time those slaves were carried away.

Upon looking at the testimony of Seawell, (869,) Daffin, (874,) Nichols, (877,) Flinn, (885,) and Duncan, (889,) we are satisfied that $1000 as an annual allowance after

the passage of the act of 1841, which is the estimate made by Gayle, (984,) and Blount, (983,) was too much. The last named witnesses evidently do not base their opinion upon actual knowledge of the services rendered about the plantation, but upon conjecture; and one of them (Blount) evidently takes into the calculation the trouble of the administrator about the present suit. Upon looking at the testimony, we cannot say that the allowance of $300 per annum, made by the chancellor, was too little. During the latter part of the eleven years from '41 to '52, the administrator could not have been annoyed with any serious amount of litigation, and he managed the estate through overseers, for whose services he is credited; rarely visiting the plantation, and visiting it one year only a single time. Not being able to see from the testimony that there is error in the chancellor's decree adopting $300 as the annual allowance after 1841 prejudicial to the administrator, we affirm the decree in that particular.

[39.] The administrator was undoubtedly entitled to a credit for personal expenses, necessarily incurred by him in transacting the business of the estate, (Gerald v. Bunkley, *supra;*) but there is no proof of any specific account for such expenses, or for extraordinary trouble and labor, presenting the items. The effort was to obtain a general allowance, without a specification of items. The court did not err in refusing to make such an allowance. The uniform practice of the court is to refuse to make general allowances, without a specification of the items. The party must name and prove the particulars.—1 Eq. Cases Abridged, 11; 2 Dan. Ch. Pl. & Pr. 1430; Swan v. Wheeler, 4 Day, 137.

[40.] The partial settlements of the administrator before the orphans' court were *ex-parte* proceedings, and were, therefore, correctly excluded as evidence for the administrator.—Willis v. Willis, 16 Ala. 652; McCreliss' Distributees v. Hinkle, 17 Ala. 459; Duke v. Duke, 26 Ala. 673.

The chancellor, in his decree of 5th Oct., 1854, sustained the 25th, 26th, 27th, 28th, 29th, 30th, and 31st exceptions of complainants to the register's report, made on 10th

July, 1854. We affirm the chancellor's decree as to those exceptions, because its correctness is shown by the proof and admissions certified by the special register.

[41.] The chancellor did not err, in rejecting the credit claimed for the fees of Darrington's counsel in this case. We do not decide that an administrator would not, in any case, be allowed to retain out of the assets of the estate his counsel fees in a chancery suit for the settlement of the estate. It has been decided by this court, that he may be entitled to a credit for fees paid to counsel, for services rendered on a final settlement in the probate court.—Pinckard v. Pinckard, 24 Ala. 250; Bendall v. Bendall, 24 Ala. 295; see, also, Gerald v. Bunkley, *supra.* We think a legitimate application of the principle of those decisions would authorize the allowance of counsel fees in a case where a settlement of the estate in chancery became necessary in consequence of the fact, that the jurisdiction of the probate court was made inadequate to the administration of complete justice by the nature of the trusts, and not by the fault of the administrator or executor. Waiving the question, whether the necessity of this suit in chancery was not the result of the administrator's fault, in acting upon a false construction of the will, a misapprehension of his legal powers and duties, and other errors, we decide, that the chancellor did not err in the rejection of the credits claimed, because they were brought forward in gross amounts, for services in the entire case, when it is certain that much of the litigation, and a large portion of the counsel's labor, were the result of the administrator's fault. The chancellor could not designate, possibly, any particular amount which would be allowable, with the lights before him, and he therefore did not err in overruling the defendant's exceptions.

[42–44.] There are five grounds of relief, which seem to have been contemplated in the construction of the cross bill of defendant Darrington : 1st, that the property of the estate belonged to Mrs. Matherson ; 2d, that Mrs. Matherson was bound by a covenant to indemnify the defendant against his liability in this suit; 3d, that Mrs. Matherson

had released the defendant from all liability to her since the commencement of this suit; 4th, that Pearson, one of the complainants, and William A. Matherson, one of the defendants, had converted a large amount of cotton belonging to the estate; 5th, that the administrator is entitled to reimbursement out of Mrs. Matherson's share of the estate, for advancements made to her.

It is conceded that the cross bill is not maintainable on the first ground. The release of Mrs. Matherson was made after the commencement of the suit, and the filing of Darrington's answer to the original bill. It is under seal, and it remises, releases, quit-claims, and forever discharges him from all manner of action and actions, suits, debts, dues, duties, sum and sums of money, and demands of any and every nature and kind whatsoever, in law or equity. This release under seal is good, without proof of a consideration.—Chitty on Contracts, 673. This general release unquestionably embraces all claim to a pecuniary recovery in favor of Mrs. Matherson in this case.—Story on Contracts. It is not attempted to give it the effect of a transfer of Mrs. M.'s interest as a distributee in the personalty of the estate. The administrator sets up no claim to the specific property of the estate, or any interest in it. The release is not shown to have been obtained by fraud, or other unlawful means; and is a complete defense for the administrator against any monetary decree in favor of Mrs. Matherson in this case. A cross bill was the appropriate mode of setting up the new matter of defense, consisting of the release, which arose after the filing of the answer.—Taylor v. Titus, 2 Edw. Ch. 135; 3 Daniell's Ch. Pl. & Pr. 1743.

So, the cross bill was maintainable for the purpose of obtaining a set off for the cotton wrongfully carried off from the plantation. The set-off on that account was in the nature of a cross demand, and not of a payment or discharge. The cotton was taken and sold without the consent of the administrator; and he had the right to waive the tort, and sue in assumpsit for the proceeds of the sale. It was not given or accepted as a payment or discharge, *pro tanto*, of a legacy or distributive share. A set-off, dis-

tinguishable from a payment or discharge, is appropriate matter for a cross bill.—Goodwin v. McGehee, 15 Ala. 233; 3 Dan. Ch. Pl. & Pr. 1744.

As the release takes away from Mrs. Matherson all claim for a monetary decree, the cross bill was not maintainable in its feature which charges the making of advancements to her, and on her account. She has no right in the suit beyond a distributive share of the goods and chattels remaining in specie, and against that right the defendant could not set off a pecuniary demand for advancements of money.

We understand Mrs. Matherson's covenant of October, 1844, as binding her to indemnify Darrington against damage and loss by virtue of suits by her heirs, executors and administrators. It does not bind her to protect him against suits by her children, but by her heirs and representatives. She living has no heirs, executors or administrators: "*Nemo est hæres viventis.*" She had a claim to the property in her individual right, and adverse to that of the estate; and the object of the covenant was to protect the administrator against the assertion of that claim after her death.

We decide, in accordance with the views above expressed, that under the cross bill, the administrator was entitled to relief against Mrs. Matherson, to the extent of her share in any balance which might be ascertained to be in his hands, and that he was entitled to a set-off against the respective shares of the legatees for cotton of the estate converted by them; and that, therefore, the chancellor erred in the dismissal of the cross bill. But the necessity of actually allowing any offsets for such cotton is now dispensed with, in consequence of the fact that the administrator is not charged with it. The administrator, however, by virtue of the cross bill, is protected from all claim on the part of Mrs. Matherson, as a distributee of the estate, for any balance which may be ascertained in taking the account against him.

[45.] We decline to consider the errors assigned on account of the rejection of the claims of creditors against the estate. When they came in, under the decree of the

chancellor, to prove their debts, they became *quasi* parties, and might have appealed and assigned for error the rulings against them.—2 Dan. Ch. Pl. & Pr. 1358. They have not appealed, but the administrator assigns as error the rejection of their demands. The interest of the administrator was adverse to that of the creditors, when they came in to prove their demands; and it is simply absurd for him to appeal for them, and assign errors for them. If they do not choose to complain in this court, another cannot be permitted to do it for them.

After a careful and elaborate examination of the testimony and pleadings in this case, we decide, that the defendant Darrington should be taxed with two-thirds of the costs of the original cause in the court below, and that the remaining one-third of the costs in the original cause shall be paid out of the assets. The defendants in the cross bill, against whom relief is obtained, must pay the costs in the cross cause in the court below.

The decree of the court below is reversed, both on the appeal of the defendant Darrington, and of the complainants, and the appellees in the respective appeals. It is ordered, adjudged, and decreed, that a reference be made to the register of the chancery court held at Cahaba, to restate the account between the administrator of the estate of William Matherson, deceased, and the said estate; and that in stating the said account, he shall allow and reject charges and credits as they were allowed and rejected by the register and special register, where they were not excepted to; and in all cases where they were excepted to, he shall allow and reject them as directed by the chancellor's decrees, except so far as the chancellor's decrees are reversed, either in whole or in part, by the foregoing opinion; and as to all items passed upon in the foregoing opinion, he shall allow and reject charges and credits according to said opinion; and in determining whether the chancellor's decrees allow or reject any item, either in whole or in part, he shall be guided by the decree of the chancellor upon the last reference of that item. It is further ordered, that the register ascertain the balance

upon the said account, and that he report to the next term of the chancery court at Cahaba.

The cause is remanded to the court below, that the chancellor may render a complete decree in the cause, and have such further proceedings as it may require, not inconsistent with the foregoing opinion. The appellees in the original and cross appeals must pay the costs of the respective appeals; and the costs of the transcript shall be equally divided between them.

The cause of the unusual length of this opinion is to be found in the voluminousness of the transcript, which contains nearly 1500 closely written pages, and the extraordinary number of points presented by the assignments of error.

Rice, C. J., not sitting.