189 So.2d 558

Clyde W. LEO

v.

Marie C. LEO.

1 Div. 317.

Supreme Court of Alabama.

June 16, 1966.

Rehearing Granted Aug. 25, 1966.

HARWOOD, Justice.

Mrs. Clyde Leo was awarded a divorce from Clyde Leo on the grounds of desertion and cruelty. In her bill she asked for alimony, both pendente lite and permanent. She also prayed for solicitor's fees.

Mrs. Leo was awarded $400.00 per month as alimony pendente lite, but this phase of the decree is not involved in this appeal.

In its final decree, dated 2 July 1965, the court ordered the respondent to:

"* * * pay to the Complainant the sum of $25,000.00 cash, and in addition thereto the sum of $450.00 per month as alimony * * *

"It is also further ORDERED, ADJUDGED and DECREED by the Court that the Defendant herein be and hereby shall be responsible for the payments of all outstanding indebtednesses incurred during the marriage of the said parties in the amount of $7,329.77.

"It is also further ORDERED, ADJUDGED and DECREED by the Court that a lien be and hereby is specifically imposed on the stock in the name of the Defendant in the corporation known as Town and Country Estates, Inc., and Pine Springs Farms, Inc., until such time as the $25,000.00 hereinabove awarded has been satisfied."

Johnston, Johnston & Nettles, Mobile, for appellant.

Collins, Galloway & Murphy, Mobile, for appellee.

From this decree the respondent perfected an appeal to this court. Appellant does not question the granting of the divorce a vinculo, but does strenuously argue that the alimony and the allowances awarded are unreasonable and excessive in view of the evidence introduced in the trial below.

The evidence shows that Mr. and Mrs. Leo were married in 1952 in Mobile, and immediately went on a European honeymoon. After returning from their honeymoon, the couple went to Honolulu where Mr. Leo owned some property. They stayed in Honolulu approximately six months, during which time Mr. Leo sold the property he owned in Honolulu. They returned to Mobile in 1956. Mr. Leo did not work for some time after their return to Mobile, but went to the stock market every day.

Eventually Mrs. Leo interested Mr. Leo in purchasing some land in Mobile which was developed into Town and Country Estates. Mr. Leo paid $14,000 for this land.

On her direct examination, Mrs. Leo was asked if she had an opinion as to Mr. Leo's financial worth. To this question she answered, "Well, I think it's pretty much. I think he probaby can, I *imagine* it's around three to six hundred thousand dollars all together."

We have underlined the word "imagine" to emphasize our conclusion that these figures were merely picked out of thin air and have no factual support in the record. Such evidence is of no valid probative value.

■ A witness will not be permitted to express an opinion where the facts on which such opinion are based may be ascertained and made intelligible to the court and jury. Jones on Evidence, Vol. 2, Sec. 409. Further, it is elemental that opinion testimony of non-expert witnesses is limited to such opinions or inferences as a judge finds may be based on perception of the witness. Throughout her testimony on both direct and cross examination, Mrs. Leo made it clear that Mr. Leo was always secretive as to his finances and that in truth and in fact she knew nothing about them. For instance, while it was Mrs. Leo's contention that Mr. Leo was highly successful in the stock market because he had been in the stock market all his life, she later testified that she did not know the value of his stocks because "he never let me know anything about any of it" and that he never discussed his financial status with her. As to his bank account, Mrs. Leo testified that since their marriage Mr. Leo had always kept his account in a bank in Greensburg, Indiana, and she knew nothing about the status of his bank account.

Mrs. Leo testified that upon the formation of the Town and Country Corporation that the First National Bank loaned to the corporation $150,000 on a basis of five years, the First Federal put up $350,000 on a basis of seven years, Mr. Leo put in approximately $100,000 and Mr. Cook's mother-in-law put in $26,000. On the other hand, it was Mr. Leo's testimony that upon its incorporation in 1955, the First National Bank loaned $33,300, the First Federal loaned $150,000, Mrs. C. C. Cleveland loaned $37,000 and a Mrs. Pierce loaned $30,680.

As before stated, upon a careful perusal of Mrs. Leo's testimony, we can find nothing therein which can furnish any evidence of any probative value as to Mr. Leo's worth. To a large extent, therefore, we must look to Mr. Leo's testimony in this connection.

Mr. Leo testified that when he returned to Mobile after selling his property in Honolulu, his net worth was approximately $105,000, and that at the time of the trial below his net worth was between 90 and $110,000, and that he would estimate it to be $100,000. The bulk of his estate is in accounts receivable due to Town and Country Estates or the Pine Springs Farms. Mr. Leo is a "half owner" of Town and Country Estates which in turn owns a second subdivision, to-wit, Pine Springs Farms. The only bank account and records are maintained in the name of Town and Country Estates.

Aside from his interest in the real estate developments, a statement of assets and liabilities prepared by Mr. Leo shows his net worth to be approximately $16,700. Included in this estimate are equities in stocks valued at approximately $8,600. Apparently in the period of the 1950's, Mr. Leo did deal in stocks on margin. Since 1959, he has had a $30,000 loss carryover. While he made $11,000 in the stock market in 1961, this profit was reinvested in stocks and in 1962 he had a loss of $37,000, and in 1964 he had a loss of $19,000.

As to his income, copies of his income tax reports received in evidence shows that Mr. Leo's "total income" in 1960 was $10,821. In 1961, it was $12,100, in 1963, it was $11,163, and in 1964, it was $11,962. No copies of income tax returns for 1962 were introduced, though a withholding statement by Steiner-Rouse & Company for this year indicates that he earned $1200 with that company for that year. Included in his gross income for these years was an item of $1800 for automobile expenses, although, according to Mr. Leo, he drove his car for some 20,000 miles per year on business operations, that therefore the $1800 allowance which he showed on his income tax return could not be considered as income received by him.

The evidence shows that the Leo marriage was one of turbulence through the years, and Mrs. Leo testified that they had separated some eight times during the marriage. At the time of the last separation, they were living in an apartment on Ann Street in Mobile for which the rent was $87.50 per month. After Mr. Leo left, Mrs. Leo remained in this apartment for some four months, when she moved into another apartment that rented for $195 per month, which was later reduced to $165 per month. According to Mrs. Leo, Mr. Leo had always been "frugal" during their marriage. When Mrs. Leo moved into the new apartment, she stored most of the furniture, and proceeded to buy other furniture. The evidence shows that she purchased for the new apartment, dining room furniture at the cost

of $977.16. During this time she also purchased a mink stole for $1400, and she incurred a bill at Gayfer's Department Store in the amount of $871.00, testifying "he can afford it, believe me."

The evidence also shows that during the separation she borrowed $1000 from the Merchants Bank of Mobile, for living expenses, and $1000 from her sister when she went to Mayo's Hospital. These items, and others, were included in the debts ordered to be paid in the decree of the court.

Mrs. Leo testified that after their final separation and after she had moved to the second apartment, Mr. Leo paid her $262.50 per month plus her utilities and her drug bill. As to the $1000 which she borrowed from her sister, Mrs. Leo testified that she borrowed this money in September at the time she went to the Mayo Hospital. The evidence shows, however, that at this time Mr. Leo gave her $400.00 for expenses and paid for train tickets for her and her sister. He also paid the Mayo bill which was $384.00.

The evidence also shows that after Mrs. Leo moved out of the Ann Street apartment, Mr. Leo returned to live therein. Mrs. Leo would go to the apartment and gain entrance thereto with a master pass key, even though Mr. Leo had had the locks changed. Her intention in going there was to go through Mr. Leo's papers, as she was married to him but she did not find much to "go through." On her last visit there in Mr. Leo's absence, she had all the furniture moved out, including the built-in kitchen cabinets and the window air conditioners, leaving Mr. Leo's possessions (clothing, etc.) piled in the middle of the floor.

### Award of $25,000 in Gross

A decree for alimony in gross, if without reservation, becomes a vested right from its rendition and survives the death of the husband. Differing from a mere periodic allowance for current and continuous support, it is intended to effect

a final termination of the property rights and relations of the parties. Epps v. Epps, 218 Ala. 667, 120 So. 150. However, in consideration for the husband, the decree should not be to "cripple him by compelling a sacrifice of his property. His ability to pay and hers to collect should alike be taken into the account and duly adjusted." Ortman v. Ortman, 203 Ala. 167, 82 So. 417.

As before stated, the bulk of Mr. Leo's assets consists of accounts receivable in connection with sales of houses and lots in the aforementioned real estate developments. The houses that were built were inexpensive and usually required no money down in the purchase thereof. The turn over of these houses is apparently high. The mortgages to the corporations are from twelve to fifteen years. Upon default of the mortgages, the houses are resold. Mr. Leo testified that if all of the original purchasers had paid the mortgages as due, the corporation would now be out of business, it having been originally intended that the operations would be on a twelve year basis. Reselling and refinancing have, however, continued the life of the corporations. Mr. Leo further testified that in two years the original purchasers will have paid their mortgages and the corporations would drop "32 payments out of 66." The closing of Brookley Field has seriously affected the type of houses owned by the corporations and Mr. Leo testified that he would be happy to discount the accounts receivable by 30 per cent.

Even if it could be worked out, it is difficult to see how Mr. Leo could liquidate his interests in the corporations without considerable financial sacrifice. Since his net assets, other than his interests in the corporations, as shown by his testimony amount to only $16,700, in order to pay the lump sum award of $25,000 and the debts in the amount of $7,329.77, a total of $32,329.77, it is self evident that Mr. Leo would have to sacrifice his capital assets or go to jail if such sums were not paid. Equity should not require this to be done.

It would appear that a more equitable award of gross alimony would be an amount not to exceed fifty per cent of Mr. Leo's assets other than his assets represented by his interest in the real estate development. Since the only evidence before the court indicates that these assets are $16,700, the decree in the phase of awarding gross alimony of $25,000 is reversed and one is here rendered fixing this amount at $8,350.

### Payment of Debts Incurred during Separation

It is apparent from the evidence that a number of the debts incurred by Mrs. Leo were for goods purchased on her own account, on her own contract, and not on the basis of credit extended to Mr. Leo, nor was there any expressed or implied assent on his part to pay these debts or the loans made to Mrs. Leo.

Mrs. Leo testified that she borrowed $1000 from her sister in order to go to the Mayo Hospital. The evidence shows that Mr. Leo paid the expenses of this trip including the Mayo bill. Mrs. Leo testified she did not get any money from Mr. Leo for this trip as he had not been around for several weeks. Clearly, this loan was credit extended to Mrs. Leo and there was no expressed or implied assent on the part of Mr. Leo to pay this loan. This item of $1000 should be stricken from the debts ordered to be paid by Mr. Leo.

The same reason would apply to the loan of $1000 made to Mrs. Leo by the Merchants Bank, since under Mrs. Leo's testimony this loan was made solely to her, "Ward Faulk let me have the money." This loan was made at approximately the same time as the loan by Mrs. Leo's sister, and according to Mrs. Leo was used for living expenses. "I am used to living a lot better than some people, I guess."

Likewise, the only inference from the evidence is that credit for the mink stole, $1400, the dining room suite, $977.16, and $608.04 for a stereo record player, was ex-

tended solely to Mrs. Leo. The learned trial court erred in decreeing that these debts incurred by Mrs. Leo should be paid by Mr. Leo. Frazier v. Frazier, 273 Ala. 53, 134 So.2d 205. This phase of the decree will also be reversed to the extent of eliminating the above mentioned debts from those to be paid by Mr. Leo and one is hereby rendered accordingly.

The remaining items or debts ordered to be paid by the decree of the court consist largely of medical and hospital expenses, and the evidence shows that Mr. Leo has in the past always taken care of these expenses. In fact, the record shows that in 1963 and in 1964, Mr. Leo paid medical expenses for Mrs. Leo of around $3,400 each year and Mr. Leo testified that since 1959 he has paid medical expenses for Mrs. Leo totaling around $28,000.

We find this significant paragraph in the partial report of the Deputy Register before whom a reference was held in connection with fixing alimony pendente lite:

"It also further appears * * * that the difference between his" (Mr. Leo's) "gross income and gross expenditures is being presently satisfied through assets which are being rapidly depleted through excessive medical expenses of the complainant" (Mrs. Leo) "and living expenses of the parties."

### Allowance of $450.00 per Month

■ Allowance of $450.00 per month to Mrs. Leo would appear to be approximately fifty per cent of the average income received by Mr. Leo for the past four years. The decree is affirmed in this phase.

### Solicitor's Fees

■ Evidence before the court below by members of the bar as to a reasonable solicitor's fee in this case range from approximately $1500 to $2500. The court fixed the fee for Mrs. Leo's counsel at $2000. The record in this case is rather voluminous and in addition to the main trial, there were various motions and references which required the attention of Mrs. Leo's counsel. All in all it cannot be said that the solicitor's fee allowed by the court was not a proper one, and the decree in this aspect is affirmed. Since no issue was raised as to the award of the divorce itself, and since a reading of the record indicates sufficient evidence to support the decree in this regard, it necessarily follows that the decree in this aspect is due to be affirmed.

Affirmed in part; reversed and rendered in part.

LIVINGSTON, C. J., and GOODWYN and MERRILL, JJ., concur.

### On Rehearing

HARWOOD, Justice.

Both the appellee and appellant have filed applications for rehearing.

The appellee argues principally that we erred in reducing the amount awarded by the lower court as alimony in gross. We have reconsidered our opinion in this aspect and adhere to our original conclusions.

■ In brief on application for rehearing counsel for appellee has also requested that a solicitor's fee be awarded for representation of Mrs. Leo in this appeal. No such request was made upon original submission, and therefore no consideration was given to such question. Having been raised for the first time on application for rehearing, it comes too late for our consideration.

The application of the appellee for a rehearing is denied.

■ The appellant, in his application for rehearing, suggests that our original opinion should be modified by eliminating certain items from the debts incurred by Mrs. Leo after the separation of the parties and which the lower court decreed should be paid by Mr. Leo. Upon further considera-

tion, we are of the opinion that appellant's contentions in this regard are well taken.

In our original opinion, we discussed several of these debts, and rendered an opinion eliminating them from debts to be paid by the appellant.

While Mrs. Leo testified in reference to a few of these items, the evidence concerning the debts incurred by her after the separation consists only of her exhibit No. 7, listing some twenty-five to thirty of her creditors.

Appellee's exhibit No. 7, supra, bears the descriptive title: "Credit Obligation of Mrs. Clyde W. Leo."

Some sixteen of the items listed on this exhibit are clearly for medical, drug, or other expenses related to medical treatment of Mrs. Leo. These medical items aggregate $617.24. As before stated, the appellant has in the past always paid appellee's medical expenses, and on this appeal has not questioned the lower court's order in reference to the payment by him of the medical expenses incurred by Mrs. Leo after the separation.

In Frazier v. Frazier, 273 Ala. 53, 134 So. 2d 204, the lower court in its decree of divorce had ordered the husband to pay certain bills incurred by the wife after the couple had separated. The wife during such time had purchased in her own name wearing apparel and personal miscellaneous items for herself. The lower court had ordered the husband to pay these bills on the assumption they were necessities for which the husband was liable.

In reversing the decree of the lower court in the aspect of ordering the husband to pay these debts, and rendering it in such aspect, this court wrote:

"In the light of the authorities this ruling cannot be sustained. Appellee purchased these goods on her own account, on her own contract and no credit was extended to appellant, nor was there any express or implied assent on his part to pay for these goods purchased by his wife.

"The apposite principle is stated in Gafford v. Dunham, 111 Ala. 551, 553, 20 So. 346, 347:

'The common-law liability of the husband for necessaries and suitable comforts has always rested upon the assumption that credit was given to the husband, and not to the wife, and that the purchase was made with his implied assent. In no case did this liability arise when the facts showed affirmatively that credit was given to the wife, and charged to her, and not to the husband, and the goods were sold not upon his implied assent that they were to be charged to him.'

"Also, 'the fact that the charge was to her, shows prima facie at least, that the credit was given to her.' Pearson v. Darrington, 32 Ala. 227, 243. See McMillan v. Fabretta, 231 Ala. 188, 163 So. 793; O'Connor v. Chamberlain, 59 Ala. 431, 436. In fact, there is no evidence to the contrary and, in our view, the learned trial court erred in decreeing that these debts incurred by appellee be paid by the appellant."

The above doctrines necessitate the conclusion that the portion of the decree now being considered ordering the appellant (Mr. Leo) to pay the debts of Mrs. Leo incurred by her following their separation can be affirmed only to the extent of payment of Mrs. Leo's debts for medical expenses, i.e., $617.24.

As to the remaining portion of the debts of Mrs. Leo incurred after the separation, over and above the debts for medical expenses of $617.24, which remainder was ordered by the court to be paid by Mr. Leo, the decree of the lower court is reversed to this extent and one is hereby rendered in favor of the appellant, Mr. Leo.

The application of the appellant for a rehearing is granted, and our original opinion is modified to the extent indicated.

Appellee's application for rehearing denied.

Appellant's application for rehearing granted and opinion modified.

LIVINGSTON, C. J., and SIMPSON and MERRILL, JJ., concur.